# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

* * * * *

| | |
|---|---|
| JASON SHURB, | |
| Plaintiff, | **Civil Action No. _____** |
| v. | |
| THE UNIVERSITY OF TEXAS HEALTH SCIENCE CENTER AT HOUSTON-SCHOOL OF MEDICINE; THE METHODIST HOSPITAL; PATRICIA E. CARVER, individually and in her official capacity as Director of Admissions and Student Affairs at the University of Texas Medical School at Houston; GIUSEPPE N. COLASURDO, individually and in his official capacity as Dean, University of Texas Medical School at Houston; MARGARET C. MCNEESE, individually and in her official capacity as Associate Dean for Admissions & Student Affairs; DOE I and DOES II-XX, inclusive, | |
| Defendants. | |

## PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, JASON SHURB, (hereinafter, referred to as "Shurb"), by and through his attorney of record, Jason J. Bach, Esq., of The Bach Law Group, PLLC, complaining of the UNIVERSITY OF TEXAS HEALTH SCIENCE CENTER AT HOUSTON-SCHOOL OF MEDICINE (hereinafter, referred to as "the University"), THE METHODIST HOSPITAL (hereinafter, referred to as "the Hospital"), PATRICIA E. CARVER, individually and in her

1

official capacity as Director of Admissions and Student Affairs at the University of Texas Medical School at Houston (hereinafter, referred to as "Carver"), GIUSEPPE N. COLASURDO, individually and in his official capacity as Dean, University of Texas Medical School at Houston (hereinafter, referred to as "Colasurdo"), MARGARET C. MCNEESE, individually and in her official capacity as Associate Dean for Admissions & Student Affairs; Doe I and Does II-XX; and files this his Original Complaint and Jury Demand and would respectfully show as follows:

This is a Complaint for Damages and injunctive relief brought by a student of the University. The claims against the University and faculty of this public university are based upon Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794a (hereinafter, referred to as "the Rehabilitation Act") and the Americans with Disabilities Act, 42 U.S.C. § 12101, *et. seq.* (hereinafter, referred to as "ADA"), Chapter 611 of the Texas Health and Safety Code, and Chapter 321 of the Texas Health & Safety Code, 42 U.S.C. §1983. Shurb also relies on the University's Policy on Appropriate Student Treatment and Rules and Regulations and alleges a pendent breach of contract claim. Shurb has also asserted a claim against University and Hospital Defendants for negligent hiring, training, and supervision, and all Defendants for intentional infliction of emotional distress, and injunctive and declaratory relief.

## NATURE AND COMPLAINT OF THE ACTION

1. Plaintiff Jason Shurb is a person with a disability. He began attending the University in the fall of 2009. Shurb required an accommodation in one of his classes, and he asked the professor on a number of occasions for said accommodation but the professor failed to respond. Shurb then sought out Defendant Colasurdo for support, but Colasurdo too failed to respond to Shurb. Shurb's mother then sent a letter to Colasurdo who finally responded to her.

. . .

2

2.      In September of 2011, Shurb became extremely ill and was hospitalized for six (6) days from September 10, 2011, to September 16, 2011.  While at the Hospital, the medical staff was in communication with University personnel.  Without his permission or consent, Shurb's confidential medical information records were shared with University personnel by the Hospital.

3.      Shurb was released from the Hospital without any special medical or mental health considerations.  Upon being released from the Hospital, Shurb returned to his classes at the University for about twelve (12) days.

4.      On or about September 28, 2011, without any notice, Student Affairs officials from the University showed up at Shurb's class and forced him to leave.  Apparently, University Student Affairs officials believed Shurb was a danger to himself or others, based upon the information that was illegally provided by Waters, almost two (2) weeks before the removal, even though he was now attending school without incident or complaint.

5.      In any case, University Student Affairs officials then placed several unnecessary, unsubstantiated, and unlawful conditions on Shurb's return to medical school; including, requiring Shurb to provide a note from his personal psychiatrist that he was not a danger to himself or others.

6.      Shurb reasonably believes that these conditions were without merit and intruded on his private medical and mental health records that were not commensurate with both his medical condition, federal law, and the rules promulgated thereunder and the University's own policies and procedures.  Shurb also believes the conditions were in retaliation for both he and his mother strongly advocating on his behalf for accommodations in his educational plan.

7.      Nevertheless, Shurb attempted to comply with the University's draconian conditions, but the University rejected Shurb's efforts to comply.  The University was adamant

that Shurb could not return to class until the conditions were met. Due to these unwarranted conditions, Shurb missed several classes, was unable to make up exams, and ultimately was informed by a letter in the spring of 2012 that he was withdrawn from a semester of medical school. Because the medical school curriculum required completing and passing the fall semester, Shurb was set back a year and would not be able to enroll for the spring 2012 semester.

8.      Shurb brings this action against Defendant University, pursuant to Section 504 of the Rehabilitation Act and the ADA, for discriminating against him based upon his disability, as more fully described below.

9.      Shurb also brings suit against Defendant Hospital, pursuant to Chapter 611 of the Texas Health and Safety Code, Chapter 321 of the Texas Health & Safety Code, Section 504 of the Rehabilitation Act and the ADA.

10.      It was necessary for Shurb to hire the undersigned attorneys to file this lawsuit. Upon judgment, Shurb is entitled to an award of attorney fees and costs under the Rehabilitation Act as well as pursuant to the ADA and Chapter 321 of the Texas Health & Safety Code; 29 U.S.C. § 701, *et. seq.*, 42 U.S.C. § 12101, *et. seq.*; 42 U.S.C. §1988 and further relief as justice requires.

## JURISDICTION

11.      Jurisdiction is conferred upon this Court, pursuant to 28 U.S.C.A. §§ 1331 and 1343, because the matters in controversy arise under the laws of the United States. In addition, jurisdiction is conferred upon this Court, pursuant to the Rehabilitation Act and the ADA and the federal regulations of both, issued thereunder. Further, this Court has jurisdiction to award attorney's fees and costs to Shurb under the Rehabilitation Act and the ADA, and also pursuant to 42 U.S.C. § 2000d *et. seq*.

4

12.     This Court also has supplemental jurisdiction over state claims against Defendants Hospital, pursuant to 28 U.S.C. § 1367.  Additionally, the Court may award attorney fees and costs to Shurb, pursuant to Chapters 321 and 611 of the Texas Health & Safety Code.

## VENUE

13.     Under 28 U.S.C. § 1391, venue is proper before this Court because the events and omissions giving rise to Shurb's claims occurred in the Southern District of Texas, Houston Division, and Shurb and Defendants are located in this district.

## PARTIES

14.     Shurb is currently a resident of the State of Texas and, at all relevant times, was a student at the University.  Shurb is also a person with a disability.

15.     Defendant University is a subdivision of the State of Texas and is duly authorized under the laws of the State of Texas to educate persons in the professional field of medicine.  At all relevant times, the University was responsible for the care, management and control of all school business within its jurisdiction; including, but not limited to, the training of administrators, educators and other staff members as the rights, and their commensurate duties, as to students with disabilities.  In addition, the University is the recipient of federal financial assistance to assure disabled and handicapped students receive appropriate accommodations and modifications as necessary.  The University may be served by and through the Dean of the School of Medicine, Giuseppe N. Colasurdo, M.D., at 6431 Fannin Street, Houston, Texas 77030.

16.     Defendant Hospital is a hospital licensed by the Texas Department of Health.  The Hospital has the duty, among other things, to provide medical care and necessary mental health services commensurate with, and among other things, relevant federal and state laws, and the

. . .

5

rules promulgated thereunder.  The Hospital may be served by and through Marc Bloom, M.D., MBA, FACHE, President & CEO, at 6565 Fannin Street, Houston, Texas 77030.

17.    Defendant Patricia E. Carver, at all times relevant, was the Director of Admissions and Student Affairs for The University.  She is named in this case both individually and in her official capacity.  She may be served at 6565 Fannin Street, #G400, Houston, Texas 77030.

18.    Defendant Giuseppe N. Colasurdo, at all times relevant, was the Dean of The University.  He is named in this case both individually and in his official capacity.  He may be served at 6565 Fannin Street, #G400, Houston, Texas 77030.

19.    Defendant, Margaret C. McNeese, at all times relevant, was the Associate Dean for Admissions & Student Affairs and is the only designated individual for students with disabilities to contact for accommodations.  She is named in this case both individually and in her official capacity as Associate Dean for Admissions & Student Affairs.  She may be served at 6565 Fannin Street, #G400, Houston, Texas 77030.

20.    Defendant Doe I, at all times relevant, was the physician, agent, or employee of the Hospital who released confidential information to the University concerning Shurb's medical condition.  The identity of Doe I is currently unknown by Shurb.

21.    That the true names or capacities, whether individual, corporate, associate or otherwise, of Defendants DOES I through XX are unknown to Shurb, who therefore, sues said Defendants by such fictitious names.  Shurb is informed and believes and thereon alleges that each of the Defendants designated herein as DOES are responsible in some manner for the events and happenings referred to in this action and proximately caused damages to Shurb as herein alleged, and that Shurb will ask leave of this Court to amend this Complaint and to insert the true names and capacities of said Defendants when the same have been ascertained to join

such Defendants in this action.

## STATEMENT OF FACTS

22.     Shurb, born on September 3, 1986, has spent years pursuing his dream of becoming a doctor.  In 2006, and during his undergraduate career, Shurb volunteered at University Hospital in San Antonio, Texas. In 2007, Shurb worked as an undergraduate research assistant in Adam Jones' Lab at Texas A&M University.  He later graduated from Texas A&M University with a 4.0 grade point average and graduated *summa cum laude*, Phi Beta Kappa, and with University Honors.

23.     During the summer of 2008, Shurb unfortunately had to miss a second consecutive summer of medical educational opportunities as he required extensive medical care. Specifically, Shurb had surgery for a congenital condition, which consisted of extensive foot surgeries.  With this and other experience as a patient and having endured years of pain before receiving this diagnosis, Shurb was inspired to become a primary care physician.

24.     Shurb excelled on the MCAT exam in the spring of 2008 and received an acceptance letter from the University on February 1, 2009.

25.     Shurb began his medical education at the University in the fall of 2009. Notwithstanding his success in college, Shurb had not only the previously noted physical medical issues but had also experienced Obsessive Compulsive Disorder, Severe Anxiety leading to occasional panic attacks, Major Depressive Disorder and a history of migraines.

26.     Due to these problems and looking out towards the obvious stressors of going to medical school, Shurb opted to take advantage of the University's Alternative Pathway program that split the first year of medical school into two (2) years, upon the advice and counsel of Sheela L. Lahoti, M.D., Assistant Dean for Admissions and Student Affairs at the University.

. . .

27.     The Office of Student Affairs became aware of Shurb's mental health conditions, disabilities and medications when he opted to participate in the Alternative Pathway program in the fall of 2009.

28.     Shurb is also a visual learner and benefits from visual aids and resources for retaining information and studying for exams.  Shurb's professors in his medical education provided him and other students access to visual aids, resources, and presentations in and out of the classroom, except for one, Dr. Leonard J. Cleary, Ph.D., Course Director, Gross Anatomy.

29.     In fall 2010, Shurb was enrolled in Gross Anatomy with Professor Cleary. Despite putting in an exorbitant amount of time into studying, Shurb was struggling.  He sent a number of e-mails to Dr. Cleary requesting access to power point presentations from class to provide the visual reinforcement he required to pass the class.  Despite the fact that many students had taken pictures of the slides in class and thus had access to them, Dr. Cleary refused to post them online because he was planning on reusing them for preparation in future year's classes and reportedly did not want them being publicly available.  Furthermore, Dr. Cleary still refused to give Shurb access to the slides even after Shurb explained that he was a visual learner and received these visual accommodations in other classes and from other professors.  Dr. Cleary even went as far as to accuse Shurb of not wanting to learn.

30.     Frustrated by Dr. Cleary's lack of accommodations and unsure of what else he could do to improve, Shurb reached out to Defendant, Colasurdo, as he was the head Dean of the Medical School and President of the University, and Shurb had exhausted all of his other resources.

31.     Shurb sent an e-mail to Colasurdo on October 16, 2010, explaining that he was failing Gross Anatomy and was in desperate need of timely advice.

. . .

32.     On October 18, 2010, after still not receiving a response, Shurb sent Colasurdo a "Second Request" with a duplicate of Shurb's initial e-mail's content.  Neither Colasurdo nor any of his assistants ever responded to either of Shurb's urgent requests for help.

33.     Aware of the lack of care, concern and timely advice from professors and other school officials, Shurb's mother sent a letter to Colasurdo on October 30, 2010, expressing her concern for her son.  Shurb's mother explained that none of the Deans or assistants responded to Shurb's voiced concerns and requests for assistance, including his professor's failure to accommodate his request for visual aids.

34.     Shurb's mother did not receive a response from Colasurdo until November 24, 2010.  Even then, rather than assuring Shurb's mother that steps were being made to rectify the school's previous oversights or disregard, or doing anything in regard to the concerns noted, Colasurdo simply told her that he could not reveal to her anything regarding Shurb's educational record.

35.     In Shurb's e-mails on October 16, 2010, and October 18, 2010, Shurb had informed Colasurdo that he had exhausted all of his other resources in searching for help.  However, in the letter to Shurb's mother, Colasurdo passed Shurb and his mother back to the Office of Student Affairs, despite knowing that the office had been incompetent in assisting Shurb in the past. Colasurdo also failed to address any of Shurb's needs for accommodation.

36.     Shurb became more and more frustrated as he was not being reasonably accommodated.  In addition, he was appalled about the school's disregard and lack of concern for his struggles.  Not surprisingly, his anxiety worsened.  Shurb began to experience blinding migraines from a lesion found on the temporal lobe of his brain.  These additional stresses and their physical effects on Shurb required that he take a medical leave of absence in the end of his

. . .

Fall 2010 semester.   Dr. Lahoti was the person who advised Shurb to take this leave in consultation with Shurb's mother.

37.      When Shurb obtained a leave of absence for medical reasons in the fall of 2010, the University required Shurb to have follow-up visits with Joyce Eileen Davidson, M.D., of the Baylor College of Medicine, and to provide a letter from Dr. Davidson that Shurb was fit to resume his classes in the fall.   Such letter was provided from Dr. Davidson to Dr. Lahoti stipulating to that effect.   Shurb was also required by Student Affairs to sign a waiver on December 1, 2010, allowing Student Affairs to contact Dr. Davidson directly. Shurb reluctantly signed such waiver.   Shurb solely authorized Dr. Davidson to speak to Student Affairs at the University as required by signing the release document and no one else.

38.      As a student in the Alternative Pathway program, Shurb was not able to complete the fall semester and thus could not participate in the spring semester as well.   For this reason, Shurb was not able to return to the University until the fall of 2011.

39.      During the fall 2011 semester, on September 8, 2011, Shurb became severely ill, convulsing, unable to walk without assistance, and unable to drink even water without vomiting. Still ill on September 10, 2011, Shurb's mother drove from San Antonio to take him to the 24-Hour Urgent Care Center in Houston, Texas.   The Urgent Care Center then transferred Shurb to the Intermediate Medical Unit (IMU) at the Hospital.

40.      While admitted at the Hospital, Shurb was interrogated in regard to his mental state and physical injuries.   Staff required Shurb to converse with a psychiatrist other than his own, and was later accused of attempted suicide by Resident Dr. Lindsay Waters (hereinafter, referred to as "Waters") and the student doctors.

41.      On September 11, 2011, Waters abruptly woke Shurb up at 4:00am.   Waters asked what medications Shurb was on and he gave her a list.   Waters then asked who prescribed

10

him the medications, and Shurb informed her that they were prescribed by his psychiatrist Dr. Davidson.

42.     Waters asked if he would mind seeing Dr. Davidson while he was in the Hospital. Shurb said he would be willing to speak with Dr. Davidson but that he did not think it would be necessary.  Shurb did not sign a consent form allowing Dr. Davidson to release his medical records to the Hospital, to speak with Hospital staff, or vice versa.  Nevertheless, Dr. Davidson received a phone call from the Hospital asking how Shurb obtained certain bruises on his body.

43.     Also around 4:00 a.m. on September 11, 2011, Waters inquired how the bruising over Shurb's eye occurred.  Shurb told Waters that the bruising was not related to his current illness, but that he had gotten it when he slipped on a rug earlier in the week.  Waters kept insisting that his stories were not adding up, and she finally bluntly accused Shurb of attempting suicide.  Waters bluntly asked Shurb, "What did [you] take?"  Shurb told Waters that he had not taken anything, other than attempting to drink water without success for the past two (2) days. Waters again said that his stories did not add up.  Waters proceeded to accuse Shurb of drinking antifreeze and ordered lab tests for ethylene glycol (antifreeze).

44.     Shurb told Waters that her assertion was ridiculous.  Waters replied, "You know we will be doing tests on your blood for everything."  Shurb responded that was great so that they could actually figure out what was wrong with him.  Waters yelled at Shurb as she stormed out of the room, "Did you take something that you know won't show up in blood tests?"  Waters then slammed Shurb's door.

45.     Shortly thereafter, rumors began to spread to other residents, students, and apparently all the way back to the University, that Shurb allegedly inflicted his condition upon himself.  Shurb believes that Waters, a 2008 graduate of the University, communicated with the University regarding Shurb's confidential educational, medical and mental health records.

46.     Although Waters accused Shurb of attempting to commit suicide, neither Waters nor anyone with the Hospital conducted an actual mental health or suicide assessment with Shurb at any time.  Nor was Shurb ever committed to the Hospital for mental health purposes.

47.     On September 12, 2011, Shurb was unable to sleep due to the physicians not giving him the large enough dose of short acting high blood pressure medication that had been prescribed to him by Dr. Davidson.  Also on this day, Shurb was informed that the Hospital had called Dr. Davidson but that she did not have privileges at the Hospital.  Shurb was asked if he would be willing to talk with one of their psychiatrists.  Shurb said he would, mistakenly thinking that the Hospital only needed to determine why Dr. Davidson had prescribed him certain medications.

48.     On September 13, 2011, two male Baylor College of Medicine students on their psychiatric rotation came into Shurb's room.  The students stated that it was their understanding that Shurb had requested to speak to a psychiatrist. Shurb corrected them that he had not requested to speak to a psychiatrist, but that he would be willing to do so.  One student proceeded to say, "So I understand you tried to commit suicide…."  Shurb was vocally upset about this statement because it was patently false.  Shurb's mother was visiting him at the time and she vehemently responded that her son had not tried to commit suicide and demanded to know who had given them such information.  The students quickly retreated from Shurb's room.

49.     Shurb's mother followed the students to their attending psychiatrist at the nursing station and informed the psychiatrist that the students had just accused her son of attempting to commit suicide.  The students blatantly claimed that they had done no such thing.  Shurb's mother accused them of lying and questioned how they could deny that they had mentioned suicide when she was in the room and heard what they had said to her son.  She then demanded to see Shurb's records to make sure that there was no accusation of attempted suicide in the

12

records. The psychiatrist responded that she could not release such records to her.  No one gave Shurb a consent form to sign so that his mother could review his medical records.

50.     Shurb's mother then went back into Shurb's room and informed him that she was not able to see his records.  Whereupon Shurb responded that he had a right to see his records. Shurb's mother once again went back to the nurse's station and informed the psychiatrist that Shurb wanted to see his records and had the right to see his records.  She then stated he can get a copy of his records after his release from the Hospital and by filling out a form. Shurb's mother then demanded to have Dr. McLendon and her team present.  When Dr. McLendon arrived, Shurb and his mother were again denied access to Shurb's hospitalization records.  Shurb informed Dr. McLendon that Waters had accused Shurb of drinking antifreeze and Waters immediately denied saying such a thing.  McLendon stated that she took Waters' words as fact and that she had "ultimate faith in her team."

51.     During Shurb's hospitalization, Shurb's mother had been in contact with Defendant Caver.  Shurb's mother informed the University that Shurb would be in the hospital for an unknown period of time.  Student Affairs wished him well and voiced no concerns regarding his absences.

52.     After much debate between Dr. McLendon and Shurb's Nephrologist, Asadulah Kahn, M.D., Shurb was released from the Hospital on September 15, 2011.  Dr. Kahn wanted to keep Shurb longer, but Shurb suspects that Dr. McLendon and her team wanted Shurb gone. Shurb was released from the Hospital at 5:00 p.m. on September 15, 2011, and recuperated at home until September 20, 2011.

53.     Shurb was not given the standard admittance and release forms.  Rather, Shurb was given a stack of release paperwork that included details of his stay and medical history.

. . .

54.     Immediately after leaving the Hospital, Shurb contacted Dr. Lahoti, inquiring about resuming classes and making up missed exams. Dr. Lahoti informed Shurb that he must prove his prolonged stay in the Hospital and provide a 'medical release' form. Shurb, while in bed recuperating from his hospital stay, promptly e-mailed Dr. Lahoti the first page of his discharge paperwork and a photo of his Hospital wristband that showed the date of his admission and account number.

55.     Despite being sent proof and dates of Shurb's hospitalization, on September 19, 2011, Dr. Lahoti informed Shurb that the documents he sent her were not sufficient evidence. Dr. Lahoti then asked Shurb to send her a note from his treating physician. Shurb inquired as to what type of documents would be sufficient evidence, yet Dr. Lahoti did not respond to Shurb's inquiry, nor his further inquiries and attempts to contact her.

56.     Despite Dr. Lahoti's knowledge that Shurb needed correct documentation to return to classes, and being forwarded Shurb's e-mails discussing his attempts to do so, Dr. Lahoti did not inform Shurb of the details of the conditions unreasonably placed on his return, until October 7, 2011.

57.     In any case, and on or around September 28, 2011, Shurb began communicating with Dr. Cleary, Histology Professor Dr. Roger J. Bick, Associate Residency Director Joanne L. Oakes, M.D. and Education Coordinator Melanie Stevenson, to set up dates for his make-up exams, labs, and clinics.

58.     On September 28, 2011, Shurb informed Oakes that he was having difficulties obtaining "proper" proof of his hospitalization. Shurb left messages for Dr. McLendon daily and she did not return any of them. Oakes replied, stating that Shurb's admission and discharge paperwork should be sufficient, as it would not give details of his stay and would not violate HIPPA laws. Oakes offered to try to contact Shurb's doctors for him to obtain the necessary

14

paperwork.  Oakes emphasized that it was essential to get Shurb back on track at school and to avoid any further delays.  Shurb copied and/or forwarded these e-mails to Dr. Lahoti.

59.     Oakes was able to reach Shurb's attending physician, Dr. McLendon, and his nephrologists, Dr. Khan, the same day she called them. Dr. Khan informed Oakes that he was only a consultant and she would need to talk to Dr. McLendon. Dr. McLendon said she would e-mail Shurb the requested documents later that day.

60.     The Hospital did not have Shurb sign any consent forms before having a conversation with Oakes at the University regarding his hospital stay.

61.     After Oakes' assistance in obtaining documentation of his hospitalization, Shurb had still not heard back from Dr. Lahoti. Therefore, believing he had clearance to resume attending classes, Shurb attended classes starting from September 21, 2011, thru October 7, 2011.

62.     On September 30, 2011, Shurb received an e-mail from Student Affairs that stated that Dr. Lahoti wanted to meet with Shurb that afternoon. Shurb responded, asking what the purpose of the meeting was, as he was very busy trying to catch up in his classes and study for exams.  Student Affairs replied, merely re-stating that Dr. Lahoti wanted to meet with Shurb. Shurb replied again, requesting an answer to his question.  Student Affairs responded stating that his questions would not be answered until he met with Dr. Lahoti.

63.     On October 6, 2011, after setting a make-up exam date with Dr. Cleary, Cleary informed Shurb that he had been contacted by Student Affairs and told Shurb that he could not make up his exams until he had been cleared by Student Affairs.  At this point, Shurb had gone to classes for around twelve (12) days.

64.     On October 7, 2011, while Shurb was participating in his anatomy lab, he was abruptly and involuntarily escorted out of class by a representative from Student Affairs.  Shurb

was brought to the Student Affairs Office where Margaret C. McNeese, Associate Dean for Admissions & Student Affairs, Dr. Sheela L. Lahoti, Assistant Dean for Student Affairs, and Defendant Caver, Director of Admissions & Student Affairs, were waiting for him.  The officials proceeded to inform Shurb that they were placing further conditions on him that needed to be met before he could return to his classes or make up exams.  These conditions included:  (1) disclosure of his full medical record at the Hospital; (2) disclosure of his full medical record at the 24-Hour Urgent Care Center; (3) scheduling and attending appointments with the following doctors:  (a) Dr. Davidson, his psychiatrist, to ensure he was not a threat to himself or others; (b) the Internist attending to him in the Hospital, (c) the Nephrologist attending to him in the Hospital; (d) the Hepatologist, for a minor finding in a CT scan; and (4) signing and returning five "Authorization for the Use and Disclosure of Protected Health Information" forms to the Student Affairs Office.  When Shurb inquired why this was being required of him, McNeese responded that "they needed to protect themselves and the other students from him."

65.     There was neither a formal document given to Shurb that delineated the requirements nor was he given a rationale for the request.  Shurb believes that Dr. Lahoti changed her mind about Shurb's clearance to return to classes either because of an unauthorized contact from the Hospital stating something untrue or misleading or from Dr. McLendon's note on Shurb's release note that stated that she advised that Shurb follow up with his psychiatrist.

66.     Shurb was devastated that additional unanticipated conditions were being placed on his attendance, further delaying his medical education and career.  On October 10, 2011, Shurb and his mother met with Drs. Margaret McNeese, Sheela Lahoti, and Defendant Caver.  Shurb's mother thought it wise to audiotape the meeting.  Once she took out the tape recorder, McNeese, Lahoti and Defendant Caver refused to continue without their legal representation present.  Shurb's mother stated she only wanted to know what conditions must be met for her son

16

to obtain clearance to attend classes, but McNeese, Lahoti and Defendant Caver would not respond with an answer.  Because the school's legal representation was unavailable, they asked Shurb and his mother to arrange an appointment for a later date and handed them a business card for the legal affairs office.

67.     Shurb's mother informed them that she traveled from out of town to meet with them and that before she left she was going to speak with the Dean of the School.  Shurb and his mother went directly to the Dean's Office where the Dean seemed surprised to hear that he had been denied clearance to attend classes, even though he had been attending class for around twelve (12) days without incident.  Dean Colasurdo informed Shurb and his mother that he left such situations to the Student Affairs Office.  They reiterated that Student Affairs would not discuss the subject with them without their legal counsel in attendance.  The result of the meeting with the Dean was his instruction to his assistant to arrange a meeting with all individuals involved for the next day at the University's legal counsel's office.

68.     On the morning of October 11, 2011, Shurb e-mailed Education Coordinator Stevenson, informing her that for reasons completely unknown to him, Student Affairs deemed him unable to attend the Head Eyes Ears Neck Throat (hereinafter, referred to as "HEENT") Skill Session.

69.     Also on October 11, 2011, Shurb and his mother met with David Jenkins, Senior Legal Officer, Office of Legal Affairs.  There was no one from the Student Affairs Office present at this meeting as Shurb had been informed by Dean Colasurdo would be in attendance to answer all of his questions.  When Shurb's mother informed Jenkins of the full medical record disclosure condition placed on Shurb in order to resume classes, Jenkins seemed surprised and stated there must have been some misunderstanding.  Jenkins then instructed Shurb to obtain a Discharge

. . .

Summary from the Hospital and a report from Shurb's psychiatrist that Shurb was not a danger to himself or others, and then Shurb could return to class.

70.     Shurb did not provide the requested information believing that this would be a violation of his rights, was unreasonable and grossly overbroad.  Furthermore, by this time Shurb had already missed various classes, laboratories, exams, and educational opportunities. Specifically, Shurb missed two out of three rounds of exams.  The way the medical school structures the semesters, Shurb would now be unable to take spring classes.  Due to the discrimination Shurb endured by the school, and by the school failing to allow Shurb to return back to classes in a timely manner, Shurb has been pushed back another year.  Shurb would not be able to get back on track towards his medical education until the fall of 2013.  In addition, Shurb was still under the stipulation that he had to prove he was not a "danger to himself or others."

71.     On December 22, 2011, Defendant Caver sent a letter to Jenkins stating that Shurb should be assigned grades of "withdrawn" for fall 2011 and that Shurb would be ineligible to take courses in spring 2012.

72.     Despite Shurb and his mother's repeated contact, pleas, and satisfied documentation of his hospital stay with Student Affairs, on March 12, 2012, Defendant Caver sent a letter to Jenkins stating that Shurb had not been in attendance at the University since September of 2011, that he did not give proper documentation of his absence, that Shurb has been withdrawn from the University and that a hold has been placed on Shurb's academic records.

73.     The University states on its website that the school's Human Resources-Equal Opportunity is responsible for implementing policy and has designated a Disability Coordinator to coordinate university-wide compliance with applicable federal and state law.  However,

18

Shurb's unfortunate encounters with the Student Affairs office clearly show a lack of knowledge, or in the alternative, intentional disregard, for students like himself with disabilities and Section 504 and ADA regulations.

74.     Shurb also fears retaliation from Student Affairs for the remainder of his educational career, as well as for future career opportunities where he will need referrals and letters of recommendation.  This fear has already been substantiated.

75.     On August 15, 2011, Shurb was awarded a Perkins loan of $5,000 for the 2011-2012 school year.  On August 26, 2011, Shurb was awarded a Texas Public Education Grant in the amount of $5,000 for the 2011-2012 school year.

76.     Although the school ordered Shurb's fall 2011 courses to be graded as "withdrawn" on December 22, 2011, thus effectively withdrawing Shurb from the University for January 2012, Shurb's credit report shows that a loan from the University was opened on January 1, 2012.  Thereafter, on April 10, 2012, the University sent Shurb a letter demanding that he pay back a loan and grant in the amount of $6,441.49, (which consists of money that the University withdrew on their own, for themselves), and threatened to take out a state warrant for him if it was not repaid.

77.     The University also informed Shurb that until the above amount is paid, there is an "institutional hold" on his record.  Furthermore, Shurb was awarded a $5,000 grant, yet on Shurb's credit report, the University reported that the University loaned Shurb $5,000.  If this credit error fails to be corrected, the high credit score Shurb has spent many years building, will be severely blemished.  Thus, Shurb reasonably believes that the University has begun retaliating against Shurb by endangering his future education, career, financial standing, and investment opportunities.

. . .

## FIRST CAUSE OF ACTION

### *CLAIMS UNDER THE REHABILITATION ACT OF 1973*

78.     Shurb incorporates by reference all allegations the above related paragraphs, with the same force and effect as if herein set forth.  The facts as previously described demonstrate violations of Section 504 of the Rehabilitation Act.  Shurb is a qualified individual with a disability in the United States, as defined in 29 U.S.C. § 705(20).

79.     The University and the Hospital receive federal financial assistance, as defined by 29 U.S.C. §794, and, as such, may not discriminate against a person because of his disability.

80.     Solely by reason of his disability, Shurb was excluded from the participation in, denied the benefits of, subjected to discrimination, exploitation and a hostile educational environment at the University and at the Hospital, such acts and omissions violating the Rehabilitation Act thereby.

81.     The University and the Hospital exercised bad faith in failing to provide appropriate and necessary accommodations and modifications to Shurb, so that he could continue in his educational program, a violation of the Rehabilitation Act thereby.

82.     In addition, and in the alternative to the above-noted violation of the Rehabilitation Act, the University also violated the Act when retaliating against Shurb when he began to advocate for his rights pursuant to the Act.

83.     Such acts, omissions and failures by the University proximately caused injuries to Shurb.

. . .

. . .

. . .

. . .

## SECOND CAUSE OF ACTION

### *CLAIMS UNDER THE AMERICANS WITH DISABILITIES ACT*

84.     Shurb incorporates by reference all the above related paragraphs with the same force and effect as if herein set forth.  In addition, and in the alternative to the above, the facts as previously described also demonstrate violations of the ADA.

85.     Shurb is a "qualified individual with a disability," as defined in 42 U.S.C. § 12131(2).

86.     The University and the Hospital are each considered a "public entity," as defined in 42 U.S.C. § 12131(1), and each receives federal financial assistance so as to be covered by the mandate of the ADA.

87.     The University and the Hospital are facilities, and their operation constitutes a program and services for ADA purposes.

88.     The University and the Hospital failed and refused to reasonably accommodate Shurb in violation of Title II of the ADA.  Such failures caused injuries to Shurb.

89.     The University and the Hospital failed and refused to reasonably modify its services in violation of Title II of the ADA.  Such failures proximately caused injuries to Shurb.

90.     Defendants, and each of them, have wrongly caused Shurb to be discriminated against, denied reasonable accommodations, harassed and retaliated against, forcibly withdrawn from the program, all in violation of his rights pursuant to Section 504 of the Rehabilitation Act of 1973, depriving him of the opportunity to complete his education and further his career, and inflicting emotional distress and physical injury, all to his damage in an amount in excess of SEVENTY FIVE THOUSAND DOLLARS ($75,000.00).

91.     It has been necessary for Shurb to obtain the services of an attorney to prosecute this action, and he is entitled to an award of attorney's fees and costs of suit incurred herein.

92. Shurb is entitled to injunctive and declaratory relief to obtain the reasonable accommodations, as permitted under the statute, to allow him access and participation in this public education program and to remove any negative notations from his educational record.

### THIRD CAUSE OF ACTION

#### *CLAIMS UNDER CHAPTER 321 OF THE TEXAS HEALTH AND SAFETY CODE*

93. Shurb incorporates by reference all the above related paragraphs with the same force and effect as if herein set forth. In addition, and in the alternative to the above, the facts as previously described demonstrate violations of Chapters 241 and 321 of the Texas Health and Safety Code.

94. Shurb's "directory information" and "health care information," as defined by this section, were neither kept confidential by the Defendant health care facility nor by the health care facility professionals. Tex. Health & Safety Code Ann. § 241.151.

95. The Hospital and Doe I Defendants failed to obtain a disclosure authorization that was in writing, dated and signed by Shurb, identifying the information to be disclosed, and identifying the person or entity to who the information is to be disclosed. Tex. Health & Safety Code Ann. § 241.152.

96. Such acts, omissions and failures by said Defendants caused injuries to Shurb. Shurb has a private cause of action for such violation of his "Patient Rights," pursuant to Chapter 321 of the Texas Health & Safety Code.

### FOURTH CAUSE OF ACTION

#### *CLAIMS UNDER CHAPTER 611 OF THE TEXAS HEALTH AND SAFETY CODE*

97. Shurb incorporates by reference all the above related paragraphs with the same force and effect as if herein set forth. In addition, and in the alternative to the above, the facts as

previously described demonstrate violations of Chapter 611 of the Texas Health and Safety Code, Tex. Health & Safety Code Ann. § 611.

98.     Shurb was a patient, and the Hospital and its individual constituent Doe I were professionals, as described by Tex. Health & Safety Code Ann. § 611.001.  As a patient, Shurb had the right to claim the privilege of confidentiality.  Tex. Health & Safety Code Ann. § 611.003.

99.     The Hospital and Doe I Defendants failed to keep communications, records of the identity, diagnosis, evaluation, and treatment of Shurb confidential.  Tex. Health & Safety Code Ann. § 611.002.

100.     The Hospital and Doe I Defendants also failed to give Shurb a signed and dated written statement explaining why the Hospital denied access to any portion of his record.  Tex. Health & Safety Code Ann. § 611.0045.

101.     As an aggrieved person by the improper disclosure of confidential communications and records, Shurb may petition the court for relief accordingly.  Tex. Health & Safety Code Ann. § 611.005.

102.     Such acts, omissions and failures by said Defendants caused injuries to Shurb.

### FIFTH CAUSE OF ACTION

#### *BREACH OF CONTRACT*

103.     Shurb incorporates by reference all the above related paragraphs with the same force and effect as if herein set forth.

104.     Shurb has an express and implied contract with Defendant University in connection with rights explicitly guaranteed by the University pursuant to the University's Policy on Appropriate Student Treatment and its Rules and Regulations.

. . .

23

105.    The actions of Defendant University, including but not limited to Defendant's discrimination, denial of reasonable accommodations, physical and programmatic accessibility, harassment, retaliation, the forcible withdrawal from the program, each constitute a breach of the express and implied contract.

106.    As a result of the breach committed against Shurb, he has been damaged in an amount in excess of SEVENTY FIVE THOUSAND DOLLARS ($75,000.00).

107.    It has been necessary for Shurb to obtain the services of an attorney to prosecute this action, and Shurb is entitled to an award of attorney's fees and costs of suit incurred herein.

## SIXTH CAUSE OF ACTION

### *INTENTIONAL INFLICTION OF SEVERE MENTAL DISTRESS*

108.    Shurb incorporates by reference all the above related paragraphs with the same force and effect as if herein set forth.

109.    As a result of Defendants' intentional and negligent conduct and omissions, Shurb, suffered and continues to suffer great mental and emotional harm, anguish, insecurity, self-revulsion, damage to his self-esteem and self-worth, shame and humiliation.

110.    Shurb has required medical and/or psychological care as result of the malfeasance and nonfeasance of Defendants.  This has caused Shurb to incur expenses for medical care, treatment, and expenses incidental thereto.  The total amount of Shurb's damages cannot yet be fully ascertained and, as such, Shurb respectfully asks leave of this Court to amend this Complaint to insert the full amount when such have been fully ascertained.

111.    As a result of the mental distress described above, Shurb has suffered serious psychological injury, loss of community reputation, medical expenses, and to incur severe financial obligations in order to retain attorneys to seek redress against the unlawful conduct of

. . .

24

the Defendants, as well as grievous mental suffering, all to damages in an amount in excess of SEVENTY FIVE THOUSAND DOLLARS ($75,000.00).

112.    The acts, conduct and behavior of the Defendants were performed willfully, intentionally, oppressively, fraudulently and maliciously, by reason of which Shurb is entitled to punitive damages in a sum in excess of SEVENTY FIVE THOUSAND DOLLARS ($75,000.00).

113.    It has been necessary for Shurb to obtain the services of an attorney to prosecute this action, and Shurb is entitled to an award of attorney's fees and costs of suit incurred herein.

## SEVENTH CAUSE OF ACTION

### *NEGLIGENT HIRING, TRAINING, & SUPERVISION*

114.    Shurb incorporates by reference all the above related paragraphs with the same force and effect as if herein set forth.

115.    At all times material and relevant herein, Defendants University and Hospital had a duty of reasonable care to their students and patients.

116.    At all times relevant herein, the University had a duty not to hire individuals with a propensity towards committing unlawful acts against those who lawfully go about their business and to adequately train and supervise their agents, officers, and employees.

117.    At all times relevant herein, Defendant University had a duty to protect the public, such as Shurb, from the illegal actions of their own agents, officers, employees and others.  In addition, Defendant University had a duty not to hire individuals with a propensity towards committing unlawful acts against the public, and to adequately train and supervise their employees.

. . .

. . .

25

118.    Likewise, at all times relevant herein, Defendant Hospital had a duty not to hire individuals with a propensity towards committing unlawful acts against those who lawfully go about their business and to adequately train and supervise their agents, officers, and employees.

119.    Also, at all times relevant herein, Defendant Hospital had a duty to protect the public, such as Shurb, from the illegal actions of their own agents, officers, employees and others.  In addition, Defendant Hospital had a duty not to hire individuals with a propensity towards committing unlawful acts against the public, and to adequately train and supervise their employees.

120.    Defendants, and each of them, breached their respective duties, and are therefore negligent and liable to Shurb, who has suffered serious economic loss, loss of reputation, loss of daily and future income, and to incur severe financial obligations in order to retain attorneys, as well as other painful injuries, deprivation of his liberty, invasion of his privacy, grievous mental suffering, all to his damage in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00).

121.    It has been necessary for Shurb to obtain the services of an attorney to prosecute this action, and Shurb is entitled to an award of attorney's fees and costs of suit incurred herein.

## EIGHTH CAUSE OF ACTION

### *CIVIL RIGHTS VIOLATION 42 U.S.C. §1983, PROCEDURAL DUE PROCESS*

121.    Shurb incorporates by reference all the above related paragraphs with the same force and effect as if herein set forth.

122.    That Shurb has a clearly established right to equal access to all benefits and privileges of a public higher education and a right to be free from said illegal practices and policies.

. . .

26

123.    Defendant University failed to comply with its own policies and due process protections by placing unreasonable unnecessary conditions on him to continue his education, which were contrary to University policy, including:  (1) disclosure of his full medical record at the Hospital; (2) disclosure of his full medical record at the 24-Hour Urgent Care Center; (3) scheduling and attending appointments with the following doctors:  (a) Dr. Davidson, his psychiatrist, to ensure he was not a threat to himself or others; (b) the Internist attending to him in the Hospital, (c) the Nephrologist attending to him in the Hospital; (d) the Hepatologist, for a minor finding in a CT scan; and (4) signing and returning five "Authorization for the Use and Disclosure of Protected Health Information" forms to the Student Affairs Office.

124.    When Shurb did not comply with these requirements, he was immediately and involuntarily withdrawn from the University.  Defendants failed to allow Shurb a hearing, to be present and defend himself from the allegations against him, to confront the witnesses against him or to address any of evidence presented against him with regard to his dismissal.

125.    As a result of Defendants' actions, Shurb suffered and continues to suffer a deprivation of his rights, privileges and immunities secured to them by the Fourteenth Amendment to the United States Constitution, and is thus entitled to an award of monetary damages from the individual Defendants.

126.    That by reason of the aforesaid actions, Shurb is entitled to a Permanent Injunction requiring all Defendants, or their agents, to cease all unlawful and unconstitutional acts that they currently engage in.

127.    The acts, conduct and behavior of each of the individual Defendants was performed knowingly, intentionally, oppressively, and maliciously, by reason of which Shurb is entitled to punitive damages.

. . .

128.    It has been necessary for Shurb to obtain the services of an attorney to prosecute this action, and Shurb is entitled to an award of attorney's fees and costs of suit incurred herein.

## NINTH CAUSE OF ACTION

### *CIVIL RIGHTS VIOLATION 42 U.S.C. §1983, SUBSTANTIVE DUE PROCESS*

129.    Shurb incorporates by reference all the above related paragraphs with the same force and effect as if herein set forth.

130.    That Shurb has a clearly established right to equal access to all benefits and privileges of a public higher education and a right to be free from said illegal practices and policies.

131.    The actions of the Defendants, as described above, were arbitrary and capricious, and were not rationally related to any legitimate interest.

132.    As a result of Defendants' actions, Shurb suffered and continues to suffer a deprivation of his rights, privileges and immunities secured to them by the Fourteenth Amendment to the United States Constitution, and is thus entitled to an award of monetary damages from the individual Defendants.

133.    That by reason of the aforesaid actions, Shurb is entitled to a Permanent Injunction requiring all Defendants, or their agents, to cease all unlawful and unconstitutional acts that they currently engage in.

134.    The acts, conduct and behavior of each of the individual Defendant was performed knowingly, intentionally, oppressively, and maliciously, by reason of which Shurb is entitled to punitive damages.

135.    It has been necessary for Shurb to obtain the services of an attorney to prosecute this action, and Shurb is entitled to an award of attorney's fees and costs of suit incurred herein.

. . .

## TENTH CAUSE OF ACTION

### *CIVIL RIGHTS VIOLATION 42 U.S.C. §1983, EQUAL PROTECTION*

136.     Shurb incorporates by reference all the above related paragraphs with the same force and effect as if herein set forth.

137.     That the above actions by Defendants have resulted in the denial of equal protection rights, as a "class of one," all in violation of the Fourteenth Amendment to the United States Constitution, as Plaintiff was retaliated against, harassed, disciplined against, intimidated, and dismissed from the medical school, all against his will, and differently than those similarly situated medical students.

138.     That the actions of Defendants were the result of personal animus against the Plaintiff, and said actions and denials were taken without any rational basis.

139.     That by reason of the aforesaid actions, Defendants' actions exhibit deliberate indifference to and/or reckless disregard for the constitutional rights of Plaintiff and other similarly situated students, all in violation of his constitutional rights.

140.     As a result of Defendants' actions, Shurb suffered and continues to suffer a deprivation of his rights, privileges and immunities secured to them by the Fourteenth Amendment to the United States Constitution, and is thus entitled to an award of monetary damages from the individual Defendants.

141.     That by reason of the aforesaid actions, Shurb is entitled to a Permanent Injunction requiring all Defendants, or their agents, to cease all unlawful and unconstitutional acts that they currently engage in.

142.     The acts, conduct and behavior of each of the individual Defendant was performed knowingly, intentionally, oppressively, and maliciously, by reason of which Shurb is entitled to punitive damages.

143.    It has been necessary for Shurb to obtain the services of an attorney to prosecute this action, and Shurb is entitled to an award of attorney's fees and costs of suit incurred herein.

## DEMAND FOR A JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Shurb demands a jury trial for all issues in this matter.

## PRAYER FOR RELIEF

*WHEREFORE*, Shurb prays that this Honorable Court: Enter judgment in Shurb's favor, and against the Defendants, and each of them:  (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees, pursuant to the Rehabilitation Act and the ADA, 42 U.S.C. § 2000d *et. seq*, and also pursuant to Chapters 321 and 611 of the Texas Health & Safety Code, 42 U.S.C. §1983 and further relief as justice requires.

DATED this 4th day of February, 2013.

THE BACH LAW GROUP, PLLC


By:   */s/  Jason J. Bach*
        JASON J. BACH, ESQ.
        State Bar No. 24071556
        Southern District of Texas No. 1331975
        2802 Flintrock Trace, Suite 255
        Austin, Texas 78738
        Telephone:  (512) 879-3901
        Facsimile:  (702) 925-8788
        Attorney in Charge for Plaintiff