# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF TEXAS

# HOUSTON DIVISION

* * * * *

JASON SHURB,                                    )
                                                )
            Plaintiff,                          )
                                                )
      v.                                        )   CIVIL ACTION NO.: 4:13-cv-00271
                                                )
THE UNIVERSITY OF TEXAS HEALTH                  )
SCIENCE CENTER AT HOUSTON-SCHOOL                )
OF MEDICINE, et al.,                            )
                                                )
            Defendants.                         )
_____ )

## OPPOSITION TO STATE DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

COMES NOW, Plaintiff Jason Shurb, by and through his attorney of record, Jason J. Bach, Esq., of The Bach Law Group, PLLC, and hereby opposes the Motion to Dismiss Plaintiff's Amended Complaint filed by the State Defendants (the "State").

Plaintiff's Opposition is based on the following Memorandum of Points and Authorities, the affidavits attached hereto, all papers and pleadings on file herein, and any oral argument requested from the Court.

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

The Bach Law Group, PLLC
2802 Flintrock Trace, Suite 255
Austin, Texas 78738
Tel: (512) 879-3901   Fax: (702) 925-8788
www.BachLawGroup.com

## POINTS AND AUTHORITIES

### I.

### FACTS

Shurb began his medical education at the University of Texas ("University") in the fall of 2009. Notwithstanding his success in college, Shurb experienced Obsessive Compulsive Disorder, Severe Anxiety leading to occasional panic attacks, Major Depressive Disorder and a history of migraines. *Id., para. 25.* Due to these problems and looking out towards the obvious stressors of going to medical school, Shurb opted to take advantage of the University's Alternative Pathway program that split the first year of medical school into two (2) years, upon the advice and counsel of Sheela L. Lahoti, M.D., Assistant Dean for Admissions and Student Affairs at the University. *Id., para. 26.*

The Office of Student Affairs became aware of Shurb's mental health conditions, disabilities and medications when he opted to participate in the Alternative Pathway program in the fall of 2009. *Id., para. 27.* Shurb is also a visual learner and benefits from visual aids and resources for retaining information and studying for exams. Shurb's professors in his medical education provided him and other students access to visual aids, resources, and presentations in and out of the classroom, except for one, Dr. Leonard J. Cleary, Ph.D., Course Director, Gross Anatomy. *Id., para. 28.*

In fall 2010, Shurb was enrolled in Gross Anatomy with Professor Cleary. Despite putting in an exorbitant amount of time into studying, Shurb was struggling. He sent a number of e-mails to Dr. Cleary requesting access to power point presentations from class to provide the visual reinforcement he required to pass the class. Despite the fact that many students had taken pictures of the slides in class and thus had access to them, Dr. Cleary refused to post them online because he was planning on reusing them for preparation in future year's classes and reportedly did not want them being publicly available. Furthermore, Dr. Cleary still refused to give Shurb access to the slides even after Shurb explained that he was a visual learner and received these visual accommodations in other classes and from other professors. Dr. Cleary even went as far as to accuse Shurb of not wanting to learn. *Id., para. 29.*

Frustrated by Dr. Cleary's lack of accommodations and unsure of what else he could do to

The Bach Law Group, PLLC
2802 Flintrock Trace, Suite 255
Austin, Texas 78738
Tel: (512) 879-3901 · Fax: (702) 925-8788
www.BachLawGroup.com

improve, Shurb reached out to Defendant, Colasurdo, as he was the head Dean of the Medical School and President of the University, and Shurb had exhausted all of his other resources. *Id., para. 30.* Shurb sent an e-mail to Colasurdo on October 16, 2010, explaining that he was failing Gross Anatomy and was in desperate need of timely advice. *Id., para. 31.*

On October 18, 2010, after still not receiving a response, Shurb sent Colasurdo a "Second Request" with a duplicate of Shurb's initial e-mail's content. Neither Colasurdo nor any of his assistants ever responded to either of Shurb's urgent requests for help. *Id., para. 32.* Aware of the lack of care, concern and timely advice from professors and other school officials, Shurb's mother sent a letter to Colasurdo on October 30, 2010, expressing her concern for her son. Shurb's mother explained that none of the Deans or assistants responded to Shurb's voiced concerns and requests for assistance, including his professor's failure to accommodate his request for visual aids. *Id., para. 33.* Shurb's mother did not receive a response from Colasurdo until November 24, 2010. Even then, rather than assuring Shurb's mother that steps were being made to rectify the school's previous oversights or disregard, or doing anything in regard to the concerns noted, Colasurdo simply told her that he could not reveal to her anything regarding Shurb's educational record. *Id., para. 34.*

In Shurb's e-mails on October 16, 2010, and October 18, 2010, Shurb had informed Colasurdo that he had exhausted all of his other resources in searching for help. However, in the letter to Shurb's mother, Colasurdo passed Shurb and his mother back to the Office of Student Affairs, despite knowing that the office had been incompetent in assisting Shurb in the past. Colasurdo also failed to address any of Shurb's needs for accommodation. *Id., para. 35.*

Shurb became more and more frustrated as he was not being reasonably accommodated. In addition, he was appalled about the school's disregard and lack of concern for his struggles. Not surprisingly, his anxiety worsened. Shurb began to experience blinding migraines from a lesion found on the temporal lobe of his brain. These additional stresses and their physical effects on Shurb required that he take a medical leave of absence in the end of his Fall 2010 semester. Dr. Lahoti was the person who advised Shurb to take this leave in consultation with Shurb's mother. *Id., para. 36.*

When Shurb obtained a leave of absence for medical reasons in the fall of 2010, the

University required Shurb to have follow-up visits with Joyce Eileen Davidson, M.D., of the Baylor College of Medicine, and to provide a letter from Dr. Davidson that Shurb was fit to resume his classes in the fall. Such letter was provided from Dr. Davidson to Dr. Lahoti stipulating to that effect. Shurb was also required by Student Affairs to sign a waiver on December 1, 2010, allowing Student Affairs to contact Dr. Davidson directly. Shurb reluctantly signed such waiver. Shurb solely authorized Dr. Davidson to speak to Student Affairs at the University as required by signing the release document and no one else. *Id., para. 37.*

As a student in the Alternative Pathway program, Shurb was not able to complete the fall semester and thus could not participate in the spring semester as well. For this reason, Shurb was not able to return to the University until the fall of 2011. *Id., para. 38.*

During the fall 2011 semester, on September 8, 2011, Shurb became severely ill, convulsing, unable to walk without assistance, and unable to drink even water without vomiting. Still ill on September 10, 2011, Shurb's mother drove from San Antonio to take him to the 24-Hour Urgent Care Center in Houston, Texas. The Urgent Care Center then transferred Shurb to the Intermediate Medical Unit (IMU) at the Hospital. *Id., para. 39.* While admitted at the Hospital, Shurb was interrogated in regard to his mental state and physical injuries. Staff required Shurb to converse with a psychiatrist other than his own, and was later accused of attempted suicide by Resident Dr. Lindsay Waters (hereinafter, referred to as "Waters") and the student doctors. *Id., para. 40.*

On September 11, 2011, Waters abruptly woke Shurb up at 4:00am. Waters asked what medications Shurb was on and he gave her a list. Waters then asked who prescribed him the medications, and Shurb informed her that they were prescribed by his psychiatrist Dr. Davidson. *Id., para. 41.* Waters asked if he would mind seeing Dr. Davidson while he was in the Hospital. Shurb said he would be willing to speak with Dr. Davidson but that he did not think it would be necessary. Shurb did not sign a consent form allowing Dr. Davidson to release his medical records to the Hospital, to speak with Hospital staff, or vice versa. Nevertheless, Dr. Davidson received a phone call from the Hospital asking how Shurb obtained certain bruises on his body. *Id., para. 42.*

Also around 4:00 a.m. on September 11, 2011, Waters inquired how the bruising over Shurb's eye occurred. Shurb told Waters that the bruising was not related to his current illness, but

that he had gotten it when he slipped on a rug earlier in the week. Waters kept insisting that his stories were not adding up, and she finally bluntly accused Shurb of attempting suicide. Waters bluntly asked Shurb, "What did [you] take?" Shurb told Waters that he had not taken anything, other than attempting to drink water without success for the past two (2) days. Waters again said that his stories did not add up. Waters proceeded to accuse Shurb of drinking antifreeze and ordered lab tests for ethylene glycol (antifreeze). *Id., para. 43.* Shurb told Waters that her assertion was ridiculous. Waters replied, "You know we will be doing tests on your blood for everything." Shurb responded that was great so that they could actually figure out what was wrong with him. Waters yelled at Shurb as she stormed out of the room, "Did you take something that you know won't show up in blood tests?" Waters then slammed Shurb's door. *Id., para. 44.* Shortly thereafter, rumors began to spread to other residents, students, and apparently all the way back to the University, that Shurb allegedly inflicted his condition upon himself. Shurb believes that Waters, a 2008 graduate of the University, communicated with the University regarding Shurb's confidential educational, medical and mental health records. *Id., para. 45.* Although Waters accused Shurb of attempting to commit suicide, neither Waters nor anyone with the Hospital conducted an actual mental health or suicide assessment with Shurb at any time. Nor was Shurb ever committed to the Hospital for mental health purposes. *Id., para. 46.*

On September 12, 2011, Shurb was unable to sleep due to the physicians not giving him a large enough dose of short acting high blood pressure medication that had been prescribed to him by Dr. Davidson. Also on this day, Shurb was informed that the Hospital had called Dr. Davidson but that she did not have privileges at the Hospital. Shurb was asked if he would be willing to talk with one of their psychiatrists. Shurb said he would, mistakenly thinking that the Hospital only needed to determine why Dr. Davidson had prescribed him certain medications. *Id., para. 47.*

On September 13, 2011, two male Baylor College of Medicine students on their psychiatric rotation came into Shurb's room. The students stated that it was their understanding that Shurb had requested to speak to a psychiatrist. Shurb corrected them that he had not requested to speak to a psychiatrist, but that he would be willing to do so. One student proceeded to say, "So I understand you tried to commit suicide…." Shurb was vocally upset about this statement because it was

patently false. Shurb's mother was visiting him at the time and she vehemently responded that her son had not tried to commit suicide and demanded to know who had given them such information. The students quickly retreated from Shurb's room. *Id., para. 48.* Shurb's mother followed the students to their attending psychiatrist at the nursing station and informed the psychiatrist that the students had just accused her son of attempting to commit suicide. The students blatantly claimed that they had done no such thing. Shurb's mother accused them of lying and questioned how they could deny that they had mentioned suicide when she was in the room and heard what they had said to her son. She then demanded to see Shurb's records to make sure that there was no accusation of attempted suicide in the records. The psychiatrist responded that she could not release such records to her. No one gave Shurb a consent form to sign so that his mother could review his medical records. *Id., para. 49.* Shurb's mother then went back into Shurb's room and informed him that she was not able to see his records. Whereupon Shurb responded that he had a right to see his records. Shurb's mother once again went back to the nurse's station and informed the psychiatrist that Shurb wanted to see his records and had the right to see his records. She then stated he can get a copy of his records after his release from the Hospital and by filling out a form. Shurb's mother then demanded to have Dr. McLendon and her team present. When Dr. McLendon arrived, Shurb and his mother were again denied access to Shurb's hospitalization records. Shurb informed Dr. McLendon that Waters had accused Shurb of drinking antifreeze and Waters immediately denied saying such a thing. McLendon stated that she took Waters' words as fact and that she had "ultimate faith in her team." *Id., para. 50.*

During Shurb's hospitalization, Shurb's mother had been in contact with Defendant Caver. Shurb's mother informed the University that Shurb would be in the hospital for an unknown period of time. Student Affairs wished him well and voiced no concerns regarding his absences. *Id., para. 51.* After much debate between Dr. McLendon and Shurb's Nephrologist, Asadulah Kahn, M.D., Shurb was released from the Hospital on September 15, 2011. Dr. Kahn wanted to keep Shurb longer, but Shurb suspects that Dr. McLendon and her team wanted Shurb gone. Shurb was released from the Hospital at 5:00 p.m. on September 15, 2011, and recuperated at home until September 20, 2011. *Id., para. 52.* Shurb was not given the standard admittance and release forms. Rather, Shurb

was given a stack of release paperwork that included details of his stay and medical history. *Id., para. 53.*

Immediately after leaving the Hospital, Shurb contacted Dr. Lahoti, inquiring about resuming classes and making up missed exams. Dr. Lahoti informed Shurb that he must prove his prolonged stay in the Hospital and provide a 'medical release' form. Shurb, while in bed recuperating from his hospital stay, promptly e-mailed Dr. Lahoti the first page of his discharge paperwork and a photo of his Hospital wristband that showed the date of his admission and account number. *Id., para. 54.*

Despite being sent proof and dates of Shurb's hospitalization, on September 19, 2011, Dr. Lahoti informed Shurb that the documents he sent her were not sufficient evidence. Dr. Lahoti then asked Shurb to send her a note from his treating physician. Shurb inquired as to what type of documents would be sufficient evidence, yet Dr. Lahoti did not respond to Shurb's inquiry, nor his further inquiries and attempts to contact her. *Id., para. 55.* Despite Dr. Lahoti's knowledge that Shurb needed correct documentation to return to classes, and being forwarded Shurb's e-mails discussing his attempts to do so, Dr. Lahoti did not inform Shurb of the details of the conditions unreasonably placed on his return, until October 7, 2011. *Id., para. 56.*

In any case, and on or around September 28, 2011, Shurb began communicating with Dr. Cleary, Histology Professor Dr. Roger J. Bick, Associate Residency Director Joanne L. Oakes, M.D. and Education Coordinator Melanie Stevenson, to set up dates for his make-up exams, labs, and clinics. *Id., para. 57.*

On September 28, 2011, Shurb informed Oakes that he was having difficulties obtaining "proper" proof of his hospitalization. Shurb left messages for Dr. McLendon daily and she did not return any of them. Oakes replied, stating that Shurb's admission and discharge paperwork should be sufficient, as it would not give details of his stay and would not violate HIPPA laws. Oakes offered to try to contact Shurb's doctors for him to obtain the necessary paperwork. Oakes emphasized that it was essential to get Shurb back on track at school and to avoid any further delays. Shurb copied and/or forwarded these e-mails to Dr. Lahoti. *Id., para. 58.* Oakes was able to reach Shurb's attending physician, Dr. McLendon, and his nephrologists, Dr. Khan, the same day she called them. Dr. Khan informed Oakes that he was only a consultant and she would need to talk to

The Bach Law Group, PLLC
2802 Flintrock Trace, Suite 255
Austin, Texas 78738
Tel: (512) 879-3901  Fax: (702) 925-8788
www.BachLawGroup.com

Dr. McLendon. Dr. McLendon said she would e-mail Shurb the requested documents later that day. *Id., para. 59.* The Hospital did not have Shurb sign any consent forms before having a conversation with Oakes at the University regarding his hospital stay. *Id., para. 60.*

After Oakes' assistance in obtaining documentation of his hospitalization, Shurb had still not heard back from Dr. Lahoti. Therefore, believing he had clearance to resume attending classes, Shurb attended classes starting from September 21, 2011, thru October 7, 2011. *Id., para. 61.*

On September 30, 2011, Shurb received an e-mail from Student Affairs that stated that Dr. Lahoti wanted to meet with Shurb that afternoon. Shurb responded, asking what the purpose of the meeting was, as he was very busy trying to catch up in his classes and study for exams. Student Affairs replied, merely re-stating that Dr. Lahoti wanted to meet with Shurb. Shurb replied again, requesting an answer to his question. Student Affairs responded stating that his questions would not be answered until he met with Dr. Lahoti. *Id., para. 62.*

On October 6, 2011, after setting a make-up exam date with Dr. Cleary, Cleary informed Shurb that he had been contacted by Student Affairs and told Shurb that he could not make up his exams until he had been cleared by Student Affairs. At this point, Shurb had gone to classes for around twelve (12) days. *Id., para. 63.*

On October 7, 2011, while Shurb was participating in his anatomy lab, he was abruptly and involuntarily escorted out of class by a representative from Student Affairs. Shurb was brought to the Student Affairs Office where Margaret C. McNeese, Associate Dean for Admissions & Student Affairs, Dr. Sheela L. Lahoti, Assistant Dean for Student Affairs, and Defendant Caver, Director of Admissions & Student Affairs, were waiting for him. The officials proceeded to inform Shurb that they were placing further conditions on him that needed to be met before he could return to his classes or make up exams. These conditions included: (1) disclosure of his full medical record at the Hospital; (2) disclosure of his full medical record at the 24-Hour Urgent Care Center; (3) scheduling and attending appointments with the following doctors: (a) Dr. Davidson, his psychiatrist, to ensure he was not a threat to himself or others; (b) the Internist attending to him in the Hospital, (c) the Nephrologist attending to him in the Hospital; (d) the Hepatologist, for a minor finding in a CT scan; and (4) signing and returning five "Authorization for the Use and Disclosure

of Protected Health Information" forms to the Student Affairs Office. When Shurb inquired why this was being required of him, McNeese responded that "they needed to protect themselves and the other students from him." *Id., para. 64.* There was neither a formal document given to Shurb that delineated the requirements nor was he given a rationale for the request. Shurb believes that Dr. Lahoti changed her mind about Shurb's clearance to return to classes either because of an unauthorized contact from the Hospital stating something untrue or misleading or from Dr. McLendon's note on Shurb's release note that stated that she advised that Shurb follow up with his psychiatrist. *Id., para. 65.*

Shurb was devastated that additional unanticipated conditions were being placed on his attendance, further delaying his medical education and career. On October 10, 2011, Shurb and his mother met with Drs. Margaret McNeese, Sheela Lahoti, and Defendant Caver. Shurb's mother thought it wise to audiotape the meeting. Once she took out the tape recorder, McNeese, Lahoti and Defendant Caver refused to continue without their legal representation present. Shurb's mother stated she only wanted to know what conditions must be met for her son to obtain clearance to attend classes, but McNeese, Lahoti and Defendant Caver would not respond with an answer. Because the school's legal representation was unavailable, they asked Shurb and his mother to arrange an appointment for a later date and handed them a business card for the legal affairs office. *Id., para. 66.* Shurb's mother informed them that she traveled from out of town to meet with them and that before she left she was going to speak with the Dean of the School. Shurb and his mother went directly to the Dean's Office where the Dean seemed surprised to hear that he had been denied clearance to attend classes, even though he had been attending class for around twelve (12) days without incident. Dean Colasurdo informed Shurb and his mother that he left such situations to the Student Affairs Office. They reiterated that Student Affairs would not discuss the subject with them without their legal counsel in attendance. The result of the meeting with the Dean was his instruction to his assistant to arrange a meeting with all individuals involved for the next day at the University's legal counsel's office. *Id., para. 67.*

On the morning of October 11, 2011, Shurb e-mailed Education Coordinator Stevenson, informing her that for reasons completely unknown to him, Student Affairs deemed him unable to

attend the Head Eyes Ears Neck Throat (hereinafter, referred to as "HEENT") Skill Session. ***Id., para. 68.***

Also on October 11, 2011, Shurb and his mother met with David Jenkins, Senior Legal Officer, Office of Legal Affairs. There was no one from the Student Affairs Office present at this meeting as Shurb had been informed by Dean Colasurdo would be in attendance to answer all of his questions. When Shurb's mother informed Jenkins of the full medical record disclosure condition placed on Shurb in order to resume classes, Jenkins seemed surprised and stated there must have been some misunderstanding. Jenkins then instructed Shurb to obtain a Discharge Summary from the Hospital and a report from Shurb's psychiatrist that Shurb was not a danger to himself or others, and then Shurb could return to class. ***Id., para. 69.*** Shurb did not provide the requested information believing that this would be a violation of his rights, was unreasonable and grossly overbroad. Furthermore, by this time Shurb had already missed various classes, laboratories, exams, and educational opportunities. Specifically, Shurb missed two out of three rounds of exams. The way the medical school structures the semesters, Shurb would now be unable to take spring classes. Due to the discrimination Shurb endured by the school, and by the school failing to allow Shurb to return back to classes in a timely manner, Shurb has been pushed back another year. Shurb would not be able to get back on track towards his medical education until the fall of 2013. In addition, Shurb was still under the stipulation that he had to prove he was not a "danger to himself or others." ***Id., para. 70.***

On December 22, 2011, Defendant Caver sent a letter to Jenkins stating that Shurb should be assigned grades of "withdrawn" for fall 2011 and that Shurb would be ineligible to take courses in spring 2012. ***Id., para. 71.*** Despite Shurb and his mother's repeated contact, pleas, and satisfied documentation of his hospital stay with Student Affairs, on March 12, 2012, Defendant Caver sent a letter to Jenkins stating that Shurb had not been in attendance at the University since September of 2011, that he did not give proper documentation of his absence, that Shurb has been withdrawn from the University and that a hold has been placed on Shurb's academic records. ***Id., para. 72.***

The University states on its website that the school's Human Resources-Equal Opportunity is responsible for implementing policy and has designated a Disability Coordinator to coordinate

university-wide compliance with applicable federal and state law. However, Shurb's unfortunate encounters with the Student Affairs office clearly show a lack of knowledge, or in the alternative, intentional disregard, for students like himself with disabilities and Section 504 and ADA regulations. *Id., para. 73.* Shurb also fears retaliation from Student Affairs for the remainder of his educational career, as well as for future career opportunities where he will need referrals and letters of recommendation. This fear has already been substantiated. *Id., para. 74.*

On August 15, 2011, Shurb was awarded a Perkins loan of $5,000 for the 2011-2012 school year. On August 26, 2011, Shurb was awarded a Texas Public Education Grant in the amount of $5,000 for the 2011-2012 school year. *Id., para. 75.*

Although the school ordered Shurb's fall 2011 courses to be graded as "withdrawn" on December 22, 2011, thus effectively withdrawing Shurb from the University for January 2012, Shurb's credit report shows that a loan from the University was opened on January 1, 2012. Thereafter, on April 10, 2012, the University sent Shurb a letter demanding that he pay back a loan and grant in the amount of $6,441.49, (which consists of money that the University withdrew on their own, for themselves), and threatened to take out a state warrant for him if it was not repaid. *Id., para. 76.* The University also informed Shurb that until the above amount is paid, there is an "institutional hold" on his record. Furthermore, Shurb was awarded a $5,000 grant, yet on Shurb's credit report, the University reported that the University loaned Shurb $5,000. If this credit error fails to be corrected, the high credit score Shurb has spent many years building, will be severely blemished. Thus, Shurb reasonably believes that the University has begun retaliating against Shurb by endangering his future education, career, financial standing, and investment opportunities. *Id., para. 77.*

## II.

## LEGAL ARGUMENT

**A.    PLAINTIFF HAS ADEQUATELY STATED HIS DUE PROCESS CLAIMS PURSUANT TO 42 U.S.C. §1983.**

**1.    PLAINTIFF HAS STATED A CLAIM PURSUANT TO FRCP 12(b)(6) AND HAVE COMPLIED WITH FRCP 8(a).**

**The Bach Law Group, PLLC**
2802 Flintrock Trace, Suite 255
Austin, Texas 78738
Tel: (512) 879-3901   Fax: (702) 925-8788
www.BachLawGroup.com

The Bach Law Group, PLLC
2802 Flintrock Trace, Suite 255
Austin, Texas 78738
Tel: (512) 879-3901 · Fax: (702) 925-8788
www.BachLawGroup.com

To defeat a motion to dismiss filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." ***Bell Atl. Corp. v. Twombly***, 550 U.S. 544, 570 (2007); ***Guidry v. American Public Life Ins. Co.***, 512 F.3d 177, 180 (5th. Cir., 2007). A claim meets the plausibility test "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." ***Ashcroft v. Iqbal***, 129 S.Ct. 1937, 1949 (2009). While a complaint need not contain detailed factual allegations, it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." ***Twombly***, 550 U.S. at 555 (citation omitted). The factual actual allegations of a complaint must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact). *See Id.*

In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. ***Sonnier v. State Farm Mut. Auto. Ins. Co.***, 509 F.3d 673, 675 (5th. Cir., 2007). In ruling on such a motion, the court cannot look beyond the pleadings. ***Id.***

Federal Rule of Civil Procedure 8(a) states, in relevant part: "A pleading which sets forth a claim for relief, whether an original claim, counter-claim, cross-claim, or third-party claim, shall contain . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."

Plaintiff's Complaint provides detailed explanations of the allegations being made against the State Defendants, as well as the other Defendants. The due process allegations, brought pursuant to 42 U.S.C. §1983 and the Fourteenth Amendment, detail the procedural defects and lack of legitimate state interest which constitute a lack of due process.

**B. PLAINTIFF'S AMENDED COMPLAINT PROPERLY ALLEGES THAT STATE DEFENDANTS VIOLATED TITLE II OF THE ADA AND THE REHABILITATION ACT.**

The Rehabilitation Act and the ADA both prohibit discrimination against qualified individuals with disabilities; they employ many of the same legal standards and offer the same

remedies. ***Kemp v. Holder***, 610 F.3d 231, 234 (5th Cir. 2010). To establish a claim under either statute in "the context of a student excluded from an educational program," a plaintiff must prove that: "(1) [s]he has a disability; (2) [s]he is otherwise qualified to participate in the defendant's program; and (3) [s]he was excluded from the program on the basis of [her] disability." ***Halperin v. Wake Forest Univ. Health Sciences***, 669 F.3d 454, 461 (4th Cir. 2012).

The only difference between the ADA and Rehabilitation Act in the application of these elements concerns the final requirement. Under section 504 of the Rehabilitation Act, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a) (emphasis added). The standard in Title II of the ADA more broadly prohibits exclusion "by reason of [a] disability." Compare 42 U.S.C. § 12132 with 29 U.S.C. § 794(a). Thus, while section 504 establishes a "sole cause" test for causation, the ADA instead establishes a "motivating factor" test. ***Pinkerton v. Spellings***, 529 F.3d 513, 516-519 (5th Cir. 2008).

The Supreme Court in ***McDonnell Douglas Corp. v. Green***, 411 U.S. 792 (1973) set forth a burden-shifting scheme for discriminatory-treatment cases. Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment action. ***Id.***, at 802. If the employer meets this burden, the presumption of intentional discrimination disappears, but the plaintiff can still prove disparate treatment by, for instance, offering evidence demonstrating that the employer's explanation is pretextual. See ***Reeves v. Sanderson Plumbing Products, Inc.***, 530 U.S. 133, 143 (2000). The Courts of Appeals have consistently utilized this burden-shifting approach when reviewing motions for summary judgment in disparate-treatment cases. ***Ratheon Co. v. Hernandez***, 540 U.S. 44 (2003), also see, e.g., ***Pugh v. Attica***, 259 F.3d 619, 626 (7th Cir. 2001) (applying burden-shifting approach to an ADA disparate-treatment claim).

### 1.  Plaintiff has Plead a Qualifying Disability

Whether an impairment is substantially limiting "is determined in light of (1) the nature and severity of the impairment; (2) its duration or expected duration; and (3) its permanent or expected

permanent or long-term impact." ***Dutcher v. Ingalls Shipbuilding***, 53 F.3d 723, 726 (5th Cir. 1995) (citing 29 C.F.R. § 1630 app., § 1630.2(j)).

Defendants argue that Shurb has failed to plead a qualifying disability because he has not properly alleged that any of his disabilities, including obsessive compulsive disorder, severe anxiety leading to occasional panic attacks, major depressive disorder, and a history of migraines, limit a major life activity. Defendant's sole basis for this argument is that Shurb excelled in his undergraduate studies and on his MCAT examination. This argument fails as Shurb has clearly set forth in his Amended Complaint that he spoke with Sheela L. Lahoti, M.D., Assistant Dean for Admissions and Student Affairs at the University about these disabilities, and Dr. Lahoti recommended that Shurb participate in the University's Alternative Pathway program that split the first year of medical school into two (2) years. *Amended Complaint, para 25, 26.*

Moreover, Shurb has alleged that due to these disabilities, he is a visual learner and benefits from visual aids and resources for retaining information and studying for exams. Shurb's professors provided him and other students access to visual aids, resources, and presentations in and out of the classroom, except for one, Dr. Leonard J. Cleary, Ph.D., Course Director, Gross Anatomy. *Id., para. 28.* Despite putting in an exorbitant amount of time into studying, Shurb was struggling due to the lack of accommodation from Dr. Cleary he required. Shurb sent a number of e-mails to Dr. Cleary requesting access to power point presentations from class to provide the visual reinforcement he required to pass the class. Dr. Cleary still refused to give Shurb access to the slides even after Shurb explained that he was a visual learner and received these visual accommodations in other classes and from other professors. Dr. Cleary even went as far as to accuse Shurb of not wanting to learn. *Id., para. 29.* Shurb plead that due to the this failure to provide a simple, and reasonable accommodation, Shurb struggled in the Gross anatomy class. Accordingly, Shurb has clearly alleged that his disabilities limited a major life activity as is required under ADA and the Rehabilitation Act.

### 2. Plaintiff has Plead Discrimination Due to His Disabilities

Section 504 prohibits discrimination solely by reason of a disability, whereas the ADA applies even if discrimination is not the sole reason for the exclusion or denial of benefits.

**The Bach Law Group, PLLC**
2802 Flintrock Trace, Suite 255
Austin, Texas 78738
Tel: (512) 879-3901    Fax: (702) 925-8788
www.BachLawGroup.com

*Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005). To establish a claim for disability discrimination in the educational context, a plaintiff must allege that a school district has refused to provide reasonable accommodations for the handicapped plaintiff to receive the full benefits of the school program. *Id.*

As is set forth above, Shurb has properly plead that he was discriminated against when the University denied the reasonable accommodations he required due to his disability in his Gross Anatomy course. Additionally, Shurb plead that he made multiple requests to Dean Colursurdo regarding his need for accommodations but Colasurdo never responded to either of Shurb's urgent requests for help failed to address any of Shurb's needs for accommodation. *Id., para. 31-35.*

Shurb pled that as a result of the University's failure to provide the reasonable accommodations, his anxiety and migraines worsened to the point that Dr. Lahoti advised him to take a leave of absence from medical school. As a student in the Alternative Pathway program, Shurb was not able to complete the fall semester and thus could not participate in the spring semester as well. For this reason, Shurb was not able to return to the University until the fall of 2011 thus denying him the full benefits of the school program and delaying his graduation and forcing him to graduate at least one year later. *See Id., para. 38*

**B.    ELEVENTH AMENDMENT IMMUNITY DOES NOT APPLY TO INDIVIDUAL DEFENDANTS OR THE ABILITY OF THIS COURT TO ENJOIN ALL DEFENDANTS.**

State officials may be held personally liable for damages under § 1983 based upon actions taken in their official capacities. *Hafer v. Melo*, 502 U.S. 21 (1991). It is incorrect for a district court to interpret *Will v. Michigan Dept. of State Police*, 491 U.S. 58 (1989) to mean that § 1983 does not authorize suits against state officials for damages arising from official acts. *Hafer* at 23. State executive officials are not entitled to absolute immunity for their official actions. *Id*. at 29, *citing Scheuer v. Rhodes*, 416 U.S. 232, 243 (1974). Even if state law requires the state to pay any damages awarded against a state official, a § 1983 action is not "against" the state for the purposes of the Eleventh Amendment immunity. *Demery v. Kupperman*, 135 F.2d 1139 (9th Cir. 1984).

Moreover, nearly 100 years ago the United States Supreme Court cleared the way for plaintiffs to enforce their Constitutional Rights against state officials through injunctive relief. *Ex*

*parte Young*, 209 U.S. 123 (1908). The Court held that injunctive relief may be obtained through the federal courts when state officials are accused of violating the Fourteenth Amendment:

> [T]he use of the name of the State to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of and one which does not affect the State in its sovereign or governmental capacity . . . . The officer . . . is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct.

*Id*., at 159-160.

In other words, even if a state is immune from injunctive relief, the federal courts can put an end to unconstitutional conduct by state officials, by enjoining those state officials in their individual capacity. *Id*.

The University is subject to the injunction powers of this court, as Plaintiff's claims are constitutional in nature, not statutory.

Plaintiff has the right to bring causes of action for money damages against the individual Defendants. *See Hafer v. Melo*. This court has every ability to enjoin *all* Defendants from continuing to violate Plaintiff's constitutional rights. It may be accomplished by an order to the State university, or by an order to the individual defendants in their individual capacity, pursuant to *Ex parte Young*, 209 U.S. 123 (1908).

Moreover, the Eleventh Amendment does not bar federal suits against state officials, in their official capacity, where the relief sought is prospective in nature and is based on an ongoing violation of the plaintiff's *federal* constitutional or statutory rights. *Id.* That is certainly the case here. As alleged in Plaintiff's Complaint, Defendants have dismissed him from the University, have made notations upon his transcripts of the unlawful disciplinary actions taken against him. As such, Defendants continue to violate Plaintiff's Fourteenth Amendment Rights, which gives this Court jurisdiction over Defendants in their *official* capacity, and Defendants are not entitled to Eleventh Amendment immunity in their official capacity.

## C. PLAINTIFF HAS PROPERLY ALLEGED THAT DEFENDANTS HAVE VIOLATED HIS CONSTITUTIONAL RIGHT TO DUE PROCESS.

### 1. Plaintiff Has Alleged That He Was Not Provided with Procedural Due Process, Thus Violating His Fourteenth Amendment Rights.

A procedural due process claim requires a two part analysis: (1) whether the Plaintiff had a protected interest to which due process protection was applicable; (2) whether the Plaintiff was afforded an appropriate level of due process. *See Logan v. Zimmerman Bush Co.*, 455 U.S. 422, 428 (1982). Defendants do not dispute that Plaintiff has a protected interest in his continued education at the University. Defendants only argue that Plaintiff was afforded the appropriate level of due process prior to being dismissed from the University.

Defendants have set forth the wrong standard for the procedural requirements the University must afford Plaintiff before they deprived him of his property interest. This is a case where Plaintiff was dismissed from the University for refusing to comply with the University's unlawful and unwarranted requests that he provide them his complete medical records, that he set appointments with four different physicians, and that he sign HIPAA releases for the Student Affairs Office. Plaintiff was dismissed from the University for a disciplinary violation, not for failing to meet any academic standards. As Defendants point out in their Motion, far less stringent procedural requirements apply in the context of a student's failure to meet academic standards than those that might apply in situations where a student violates rules of conduct. *Bd. Of Curators of Univ. Of Miss. v. Horowitz*, 435 U.S. 78, 98 (1978). Hence, the University was required to provide Plaintiff with much more stringent process than the minimal or non-existent process he received prior to being dismissed from the University for his alleged conduct violation.

The Supreme Court has set forth that there is "a significant difference between the failure of a student to meet academic standards and the violation by a student of valid rules of conduct. This difference calls for far less stringent procedural requirements in the case of an academic dismissal." *Id.* at 86. The Seventh Circuit Court of Appeals has stated that more extensive procedures than even those required in *Goss* are required in the context of a university dismissal and that due process requirements depend upon context. *See Pugel v. Board of Trustees of University of Ill.*, 378 F.3d 659, 663 (7th Cir., 2004). The severity of the deprivation suggests the appropriateness of "more formal procedures." *Id.,* at 664, quoting *Goss*, 419 U.S. at 584. In *Than v. Univ. Texas Med. School Houston*, 188 F.3d 633 (5th Cir., 1999), the Fifth Circuit Court of Appeals concluded that a student was not deprived of due process on a charge of academic dishonesty when the process the student

received included (1) ample notice of the charges and the evidence, (2) a hearing before an impartial and knowledgeable hearing officer and (3) representation at that hearing by counsel, who was able to call nine witnesses, to introduce more than sixty exhibits, to cross-examine adverse witnesses and to make an opening and closing statement. *See Id.* at 634. In this case, Plaintiff was not provided any of the required due process.

Plaintiff's Complaint is clear that his dismissal was disciplinary in nature and has not alleged that he was dismissed for any academic failures. Contrary to Defendants' assertions in their Motion, Plaintiff was entitled to all the due process required under a disciplinary dismissal, not an academic dismissal. As the Complaint states:

> 123.    Defendant University failed to comply with its own policies and due process protections by placing unreasonable unnecessary conditions on him to continue his education, which were contrary to University policy, including:  (1) disclosure of his full medical record at the Hospital; (2) disclosure of his full medical record at the 24-Hour Urgent Care Center; (3) scheduling and attending appointments with the following doctors: (a) Dr. Davidson, his psychiatrist, to ensure he was not a threat to himself or others; (b) the Internist attending to him in the Hospital, (c) the Nephrologist attending to him in the Hospital; (d) the Hepatologist, for a minor finding in a CT scan; and (4) signing and returning five "Authorization for the Use and Disclosure of Protected Health Information" forms to the Student Affairs Office.
>
> 124.    When Shurb did not comply with these requirements, he was immediately and involuntarily withdrawn from the University.  Defendants failed to allow Shurb a hearing, to be present and defend himself from the allegations against him, to confront the witnesses against him or to address any of evidence presented against him with regard to his dismissal.

*See Amended Complaint.*

It is clear that Plaintiff has adequately pled his procedural due process claim as Plaintiff was not afforded any of the required due process to address the allegations against her to a conduct panel as is required under the law and under UNLV's Student Conduct Code.  Therefore, Defendants' motion to dismiss this claim should be denied.

### 2.    Plaintiff Has Alleged That He Was Not Provided with Substantive Due Process, Thus Violating His Fourteenth Amendment Rights.

In addition to the procedural protections outlined above, the Due Process Clause of the Fourteenth Amendment provides a guarantee against arbitrary decisions that would impair appellants' constitutionally protected interests. ***Dixon v. Alabama State Board of Education***, 294 F.2d 150, 157 (5th Cir. 1961), cert. denied, 368 U.S. 930 (1961)*.*  This guarantee of "substantive due

**The Bach Law Group, PLLC**
2802 Flintrock Trace, Suite 255
Austin, Texas 78738
Tel: (512) 879-3901   Fax: (702) 925-8788
www.BachLawGroup.com

**The Bach Law Group, PLLC**
2802 Flintrock Trace, Suite 255
Austin, Texas 78738
Tel: (512) 879-3901 · Fax: (702) 925-8788
www.BachLawGroup.com

process" protects certain fundamental "substantive" rights we all share. The Supreme Court has said of substantive due process that, "the Due Process Clause guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint." *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997). It provides "heightened protection against government interference with certain fundamental rights and liberty interests." *Id*. at 720. As the court stated in *Dixon*, "the governmental power to expel the plaintiffs...is not unlimited and cannot be arbitrarily exercised. Admittedly, there must be some reasonable and constitutional ground for expulsion or the courts would have a duty to require reinstatement." *Dixon*, 294 F.2d at 157. Under principles of substantive due process, students cannot be disciplined for constitutionally protected actions, or for actions which the government has no legitimate interest in punishing.

In addition to protecting such fundamental rights as free speech, substantive due process assures that any government action bear, at a minimum, a rational relationship to a legitimate governmental interest. In *Alabama & Coushatta Tribes v. Big Sandy School District*, 817 F.Supp. 1319 (E.D. Tex. 1993), the federal District Court for the Eastern District of Texas provided two theories upon which a successful substantive due process claim may be made. "If the suspensions were patently unreasonable or disproportionate to the offense, the [students] would be entitled to relief," or, if there was a "substantial departure from academic norms," the student would also be entitled to relief. *Id*. at 1335.

Courts review the disciplinary decisions of schools to ensure that they are not arbitrary and capricious, and that the process is conducted with basic fairness. *Coveney v. Pres. of Coll. of the Holy Cross*, 445 N.E.2d 136, 138 (Mass. 1983); *Ahlum v. Administrators of the Tulane Educ. Fund*, 617 So. 2d 96, 98-99 (La. Ct. App. 1993); *Psi Upsilon of Phila. v. Univiversity of Pa.*, 591 A.2d 755, 760 (Pa. Super. Ct. 1991); *Anderson*, 1995 WL 813188, at * 4-*5; *Cloud v. Trustees of Boston Univ.*, 720 F.2d 721, 725 (1st Cir. 1983).

These acts by the Defendants were taken without a legitimate state interest because placing unreasonable unnecessary conditions on Plaintiff to continue his education, which were contrary to University policy, including: (1) disclosure of his full medical record at the Hospital; (2) disclosure of his full medical record at the 24-Hour Urgent Care Center; (3) scheduling and attending appointments with the following doctors: (a) Dr. Davidson, his psychiatrist, to ensure he was not a threat to himself or others; (b) the Internist attending to him in the Hospital, (c) the Nephrologist

attending to him in the Hospital; (d) the Hepatologist, for a minor finding in a CT scan; and (4) signing and returning five "Authorization for the Use and Disclosure of Protected Health Information" forms to the Student Affairs Office and dismissing him from the University with no opportunity for Plaintiff to present evidence or confront witnesses, in complete disregard for the University's own Policy on Appropriate Student Treatment and Rules and Regulations cannot possibly have a legitimate state interest. It is fundamentally unfair when a large public university, publishes a Policy on Appropriate Student Treatment and Rules and Regulations, distributes it to the all of its students, but then chooses to ignore its own rules of due process as prescribed. These acts by the Defendants were taken without a legitimate state interest and thus violate the Plaintiff's substantive due process rights. The actions of Defendant in removing Plaintiff from medical school are arbitrary and capricious in nature, are in violation of the University's Rules and Regulations, and in violation of Plaintiffs' U.S. Constitutional Rights. As a result, Plaintiff was not given any of the due process to which he was entitled. Accordingly, Defendant's motion should be to dismiss this claim should be denied.

### D. PLAINTIFF HAS ADEQUATELY PLED HIS 42 U.S.C. §1983 EQUAL PROTECTION CLAIM.

Defendants' treatment of Plaintiff has created a "class of one" whereby Plaintiff was singled out and retaliated against due to personal animus of the Defendants. The acts and/or omissions by the Defendants were performed in violation of Plaintiffs' right to be afforded Equal Protection of the Laws, as guaranteed by the Fourteenth Amendment to the United States Constitution. This constitutional violation qualifies Plaintiffs' §1983 claims. The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within a state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents. U.S.C.A. Const.Amend. 14.

The Supreme Court of the United States, however, held in *Village of Willowbrook v. Olech*, 528 U.S. 562, 120 S.Ct. 1073 (2000), that a plaintiff can assert an equal protection claim as a "class of one." The Supreme Court granted certiorari to determine whether the Equal Protection Clause gives rise to a cause of action on behalf of a "class of one" where the plaintiff did not allege membership in a class or group. 527 U.S. 1067, 120 S.Ct. 10, 144 L.Ed.2d 841 (1999).

The Supreme Court held that its cases have recognized successful equal protection claims brought by a "class of one," where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 1074 (2000) (*citing Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340 (1923); *Allegheny Pittsburgh Coal Co. v. Commission of Webster Cty.*, 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989)).

In this case, Plaintiff has pled that he was retaliated against, harassed, disciplined against, intimidated, and dismissed from the medical school, all against his will, and differently than those similarly situated medical students. *Amended Complaint, para. 137.* Moreover, Plaintiff pled that on October 7, 2011, while Shurb was participating in his anatomy lab, he was abruptly and involuntarily escorted out of class by a representative from Student Affairs. Shurb was brought to the Student Affairs Office where Margaret C. McNeese, Associate Dean for Admissions & Student Affairs, Dr. Sheela L. Lahoti, Assistant Dean for Student Affairs, and Defendant Caver, Director of Admissions & Student Affairs, were waiting for him. The officials proceeded to inform Shurb that they were placing further conditions on him that needed to be met before he could return to his classes or make up exams. These conditions included: (1) disclosure of his full medical record at the Hospital; (2) disclosure of his full medical record at the 24-Hour Urgent Care Center; (3) scheduling and attending appointments with the following doctors: (a) Dr. Davidson, his psychiatrist, to ensure he was not a threat to himself or others; (b) the Internist attending to him in the Hospital, (c) the Nephrologist attending to him in the Hospital; (d) the Hepatologist, for a minor finding in a CT scan; and (4) signing and returning five "Authorization for the Use and Disclosure of Protected Health Information" forms to the Student Affairs Office. When Shurb inquired why this was being required of him, McNeese responded that "they needed to protect themselves and the other students from him." *Id., para. 64.* There was neither a formal document given to Shurb that delineated the requirements nor was he given a rationale for the request.

Surely, every student who misses class due to illness is not required to submit to the University's unwarranted requests set forth above or to endure the harassment, discrimination, and ultimate dismissal from medical school that Plaintiff suffered because of his illness and

hospitalization. The fact that Plaintiff was dismissed was dismissed from the University for refusing to comply with the University's unlawful requests that he present his complete medical record, meet with multiple physicians, and then be dismissed from the University without any type of hearing or opportunity to address allegations against is not a rational basis for Defendants' actions. A simple review of medical students who missed classes due to illness will identify individuals that were similarly situated to Plaintiff who were treated more favorably, thus Defendants' motion should be denied.

E. **THE TEXAS TORT CLAIMS ACT DOES NOT BAR PLAINTIFF'S INTENTIONAL INFLICTION OF EMOTION DISTRESS CLAIM AGAINST THE INDIVIDUAL DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES AS THIS CLAIM COULD NOT HAVE BEEN BROUGHT UNDER THE TEXAS TORT CLAIMS ACT**

In *Williams v. Nealon*, 199 S.W.3d 462, 467 (Tex. App., 2006), the court held that if the governmental unit's employees could not show that the claims against them could have been brought against the governmental unit under the Tort Claims Act, the employees' case could not be dismissed.

In *Nealon*, the plaintiff sued two University of Texas Medical Branch at Galveston ("UTMBG") doctors for medical negligence. *Id.* at 464. The doctors tried to use §101.106(f) in filing a motion to dismiss, arguing that the plaintiff could have sued UTMBG. *Id.* For a dismissal under §101.106(f), the doctors must show that the suit: (1) was based on conduct within the general scope of the doctors' employment with UTMBG and (2) could have been brought against UTMBG under the Tort Claims Act. *Id.* at 466. The doctors met the first requirement; however, they failed at the second requirement because a suit for medical negligence involved a discretionary decision and did not involve the negligent use of tangible property. The alleged act of negligence did not fall under one of the areas where a governmental unit waives immunity under the Tort Claims Act, (i.e. condition or use of property). *Id.* The Tort Claims Act waives sovereign immunity for a governmental unit if: (1) the injury is caused by an employee's use of a motor-driven vehicle or motor-driven equipment or (2) the injury is caused by a condition or use of tangible personal or real

property. §101.021. Therefore, the Court held that the plaintiff's claims against the doctors should not have been dismissed. *Id.* at 467.

In this case, the acts of the individual defendants, which form the basis of Plaintiff's intentional infliction of emotional distress claim, do not fall under one of the areas where a governmental unit waives immunity under the Tort Claims Act.

The Tort Claims Act waives sovereign immunity for a governmental unit if: (1) the injury is caused by an employee's use of a motor-driven vehicle or motor-driven equipment or (2) the injury is caused by a condition or use of tangible personal or real property. §101.021. In this case, Plaintiff's injuries were not caused by conduct of the individual defendants that could fit into any of these two categories. Rather, Plaintiff's claim arises due to individual defendants requiring (1) disclosure of Plaintiff's full medical record at the Hospital; (2) disclosure of his full medical record at the 24-Hour Urgent Care Center; (3) requiring scheduling and attending appointments with various doctors; (4) requiring Plaintiff to sign and return five "Authorization for the Use and Disclosure of Protected Health Information" forms to the Student Affairs Office; and (5) dismissing him from the University with no opportunity for Plaintiff to present evidence or confront witnesses, in complete disregard for the University's own Policy on Appropriate Student Treatment and Rules and Regulations. Therefore, the Texas Tort Claims Act does not bar Plaintiff's intentional infliction of emotion distress claim against the individual defendants in their individual capacities.

F.    **IN THE EVENT THAT THIS COURT IS INCLINED TO GRANT ANY PORTION OF DEFENDANTS' MOTION, PLAINTIFF REQUESTS LEAVE TO AMEND THE COMPLAINT.**

Leave to amend "shall be freely given when justice so requires." Fed. R. Civ. Pro. 15(a). While Federal Rule of Civil Procedure 15 places leave to amend within the sound discretion of the trial court, a court must remain guided by the underlying purpose of Rule 15 . . . to facilitate decision on the merits, rather than on the pleadings or technicalities. *See Conley v. Gibson*, 355 U.S. 41, 48, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957). Additionally, Rule 15(a) severely restricts the judge's freedom, directing that leave to amend shall be freely given when justice so requires. *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 597 (5th Cir., 1981). Therefore, leave to amend should not be denied

**The Bach Law Group, PLLC**
2802 Flintrock Trace, Suite 255
Austin, Texas 78738
Tel: (512) 879-3901 · Fax: (702) 925-8788
www.BachLawGroup.com

without a substantial reason such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment. ***Foman v. Davis***, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

Federal Rule of Civil Procedure 15(a) allows a plaintiff to file one amended complaint as a matter of right when the defendants have not filed a responsive pleading. The Fifth Circuit follows the prevailing view that a motion to dismiss is not a responsive pleading. ***Whitaker v. City of Houston, Tex.***, 963 F.2d 831 (5th Cir., 1992). In this case, Defendant has not filed a responsive pleading. Leave to amend should be granted "if it appears at all possible that the plaintiff can correct the defect. 3 Moore, Federal Practice, § 15.10 at 838 (2d ed. 1948). In the event that this Court were to find any of Plaintiffs' causes of action insufficient, leave to amend is graciously requested.

### III.

### CONCLUSION

WHEREFORE, for all of the foregoing reasons, Plaintiff respectfully requests that this Honorable Court deny Defendants' motion.

DATED this 15th day of May, 2013.

THE BACH LAW GROUP, PLLC
By _____*/s/ Jason J. Bach*_____
JASON J. BACH, ESQ.
State Bar No. 24071556
South District of TX No. 1331975
2802 Flintrock Trace, Suite 255
Austin, Texas 78738
jbach@bachlawfirm.com
Tel: (512) 879-3901
Fax: (702) 925-8788
Attorney for Plaintiff

The Bach Law Group, PLLC
2802 Flintrock Trace, Suite 255
Austin, Texas 78738
Tel: (512) 879-3901  Fax: (702) 925-8788
www.BachLawGroup.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of May, 2013, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means:

Darren G. Gibson
Attorney-in-charge
Assistant Attorney General
Office of the Attorney General
General Litigation Division -019
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
Darren.Gibson@texasattorneygeneral.com
Attorney for State Defendants

Dwight W. Scott, Jr.
Scott Patton PC
3939 Washington Avenue, Suite 203
Houston, TX 77007
dscott@scottpattonlaw.com
Attorney for Defendant, The Methodist Hospital

                                        s/ Jason J. Bach
                                        JASON J. BACH