**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| JASON SHURB, | § | |
| *Plaintiff*, | § | |
| | § | Civil Action No. 4:13-cv-00271 |
| v. | § | |
| | § | |
| THE UNIVERSITY OF TEXAS HEALTH | § | |
| SCIENCE CENTER AT HOUSTON– | § | |
| SCHOOL OF MEDICINE, *et al.*, | § | |
| *Defendants*. | § | |

---

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DAVID C. MATTAX
Deputy Attorney General for Defense
Litigation

JAMES "BEAU" ECCLES
Division Chief - General Litigation

DREW L. HARRIS
Texas Bar No. 24057887
Southern District No. 1114798
Assistant Attorney General
Office of the Attorney General
General Litigation Division - 019
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120
(512) 320-0667 FAX
Drew.Harris@texasattorneygeneral.gov

***ATTORNEYS FOR DEFENDANTS***

# TABLE OF CONTENTS

I.        PROCEDURAL BACKGROUND ..............................................................1

II.       SUMMARY OF ARGUMENTS..................................................................2

III.      LIST OF SUMMARY JUDGMENT EXHIBITS ....................................3

IV.       STATEMENT OF FACTS..........................................................................4
    A.   UTHealth's Accommodations for Shurb's Academic Difficulties in
        Fall 2009. ...........................................................................................4
    B.   UTHealth's Accommodations for Shurb's Academic Difficulties in
        Fall 2010. ...........................................................................................6
    C.   Shurb's September 2011 Hospitalization and Failure to Provide
        Medical Documentation to Return to School.............................................10

IV.       ARGUMENT AND AUTHORITY .........................................................13

    A.   Summary Judgment Standard .................................................................13

    B.   Shurb Cannot Establish the Elements of his ADA and
        Rehabilitation Act Claims. ..............................................................13

        1.   *Statutory Background on the ADA and Rehabilitation Act.* ...............13
        2.   *To the Extent Shurb Bases a Claim on a Purported "Visual
            Learner" Disability, He Cannot Establish the Elements of That
            Claim.*......................................................................................15
        3.   *Shurb Cannot Establish That He Was a "Qualified Individual"
            With Respect to His Continuation in Medical School.*..........................16
        4.   *Shurb Cannot Established He Was Intentionally Discriminated
            Against Because of Any Disability.*......................................................18
        5.   *Shurb Cannot Establish a Failure to Reasonably Accommodate
            Him.*.........................................................................................19
        6.   *Shurb Cannot Establish Any Retaliation Claim.*..................................19

    C.   Shurb Cannot Establish the Elements of his Procedural Due
        Process Claim.................................................................................19

    D.   Shurb Cannot Establish the Elements of his Substantive Due
        Process Claim.................................................................................22

    E.   Shurb Cannot Establish the Elements of his "Class of One" Equal
        Protection Claim. ...........................................................................23

V.        CONCLUSION .........................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Aragona v. Berry*, 2012 WL 467069  (N.D.Tex. Feb. 14, 2012)........................................... 15, 16

*Bell v. Ohio State Univ.*, 351 F.3d 240 (6th Cir. 2003) ................................................. 20

*Bennett–Nelson v. La. Bd. of Regents*, 431 F.3d 448 (5th Cir. 2005)........................................ 14

*Bissessur v. Ind. Univ. Bd. of Trustees*, No. 1:07-CV-1290, 2008 WL 4274451
   (S.D. Ind. Sept. 10, 2008) ........................................................................ 23

*Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78 (1978).......... 20, 21, 24

*Ceasar v. Holt*, 245 Fed. Appx. 396 (5th Cir. 2007) ................................................. 20

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................................... 13

*City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985) ................................ 23

*Davis v. Mann*, 882 F.2d 967 (5th Cir. 1989) ........................................................ 20

*E.E.O.C. v. Agro Distribution, LLC*, 555 F.3d 462  (5th Cir. 2009)....................................... 15, 16

*E.E.O.C. v. Chevron Phillips Chemical Co., LP*, 570 F.3d 606 (5th Cir. 2009) ......................... 16

*Engquist v. Oregon Dept. of Agr.*, 553 U.S. 591 (2008)....................................................... 23, 24

*Fan v. Brewer*, 2009 WL 1743824 (S.D.Tex. June 17, 2009) ............................................... 24

*Frame v. City of Arlington*, 657 F.3d 215 (5th Cir. 2011)................................................ 16

*Garner v. Chevron Phillips Chem. Co.*, 834 F.Supp.2d 528 (S.D.Tex. 2011) ............................ 16

*Goss v. Lopez*, 419 U.S. 565 (1975) ................................................................ 20

*Hale v. King*, 642 F.3d 492 (5th Cir. 2011) ........................................................ 14

*Heike v. Guevara*, No. 10–1728, 2013 WL 1092737 (6th Cir. Mar. 18, 2013)........................... 23

*Levitt v. University of Texas at El Paso*, 759 F.2d 1224 (5th Cir. 1985)....................................... 21

*Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731 (5th Cir. 1999)................................................. 14

*Maples v. University of Texas Medical Branch at Galveston*, 901 F.Supp.2d 874
   (S.D.Tex. 2012), aff'd 524 Fed. Appx. 93 (5th Cir. 2013) ......................................... 14

*Moulton v. City of Beaumont*, 991 F.2d 227 (5th Cir. 1993) ........................................... 22

*Nofsinger v. Virginia Comm. Univ.*, No. 3:12–CV–236, 2012 WL 2878608
   (E.D.Va. July 13, 2012) ........................................................................ 23

*Retzlaff v. de la Vina*, 606 F.Supp.2d 654 (W.D.Tex. 2009) ........................................... 25

*Senu-Oke v. Jackson State University*, 283 Fed.Appx. 236 (5th Cir. 2008)............................... 21

*Shaboon v. Duncan*, 252 F.3d 722 (5th Cir. 2001) ................................................ *passim*

*Simi Inv. Co., Inc. v. Harris County, Tex.*, 236 F.3d 240 (5th Cir. 2000)................................... 22

*Stotter v. University of Texas at San Antonio*, 508 F.3d 812 (5th Cir. 2007) ............................ 24

*Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) ............................................... 23, 24

*Wheeler v. Miller*, 168 F.3d 241 (5th Cir. 1999) .................................................... 20

*Whiting v. Univ. of So. Miss.*, 451 F.3d 339  (5th Cir. 2006)........................................... 24

*Wong v. Regents of the University of California*, 192 F.3d 807 (9th Cir.1999) ........................ 18

*Zukle v. Regents of the University of California,* 166 F.3d 1041 (9th Cir.1999)........................ 18


**Statutes and Regulations**

29 U.S.C. § 794a.................................................................................... 1, 13

42 U.S.C. § 12101, *et. seq.*....................................................................... 1, 13, 16

28 C.F.R. § 35.130(b)(7)............................................................................ 14, 15

34 C.F.R. § 104.44(a)............................................................................... 14, 15

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| JASON SHURB, | § | |
| *Plaintiff*, | § | |
| | § | Civil Action No. 4:13-cv-00271 |
| v. | § | |
| | § | |
| THE UNIVERSITY OF TEXAS HEALTH | § | |
| SCIENCE CENTER AT HOUSTON– | § | |
| SCHOOL OF MEDICINE, *et al.*, | § | |
| *Defendants*. | § | |

---

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

TO THE HONORABLE KENNETH M. HOYT:

Defendants The University of Texas Health Science Center at Houston ("UTHealth" or the "University") and Dr. Guiseppe N. Colasurdo, Dr. Margaret C. McNeese, and Patricia E. Caver, in their official capacities ("Individual Defendants"), file this *Motion for Summary Judgment* pursuant to FED. R. CIV. P. 56, and respectfully show the Court as follows:

## I.   PROCEDURAL BACKGROUND

This case arises out of Plaintiff Jason Shurb's enrollment and ultimate withdrawal from the University's Medical School. Shurb alleges that he is a person with a disability and that the University took certain actions related to his disability that resulted in his withdrawal from the Medical School in the fall of 2011. Doc. #7 (Amended Complaint) ¶¶ 2-7. Based on these allegations, Shurb brings claims against the University under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794a ("Rehabilitation Act"), and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et. seq* ("ADA"), for damages and injunctive relief. Doc. #7 ¶¶ 78-92. Shurb also asserted § 1983 claims against the Individual Defendants for alleged violations of

procedural and substantive due process, and equal protection. *Id*. ¶¶ 121-143. The Court dismissed Shurb's constitutional claims against the Individual Defendants in their individual capacities on qualified immunity grounds. Doc. #41. The Court held that Shurb may pursue claims against the Individual Defendants in their official capacities for prospective injunctive relief of reinstatement to the Medical School. Doc. #30 at 16.

Thus, this summary judgment motion will address Shurb's remaining disability discrimination claims under the Rehabilitation Act and the ADA (Counts 1-2 of the Amended Complaint), as well as Shurb's procedural and substantive due process claims (Count 8-9) and equal protection claims (Count 10). All of Shurb's other claims against the University and the Individual Defendants have been dismissed by the Court. Docs. #30, #41.[1]

Pursuant the Court's current amended scheduling order, discovery is to be completed by June 30, 2014, and dispositive motions are due the same day. Doc. #59. Docket call is set for September 8, 2014. *Id*.

## II.    SUMMARY OF ARGUMENTS

The summary judgment record reflects that Shurb had difficulty passing his Gross Anatomy class, and that the University made several accommodations to try to assist him in passing that class. These accommodations included counseling from several professors, referral to tutors, an Alternative Pathway program that split up his course load over two years, and a medical leave of absence. While Shurb claims he has various mental health disorders, he did not request accommodations for such disorders—but in any event, the University reasonably accommodated his requests for assistance with his difficult Gross Anatomy class, and did not discriminate against him on the basis of any disability.

---

[1] Shurb previously also brought claims against The Methodist Hospital for alleged disclosure of his personal medical information related to his hospitalization in September 2011. Doc. #7 ¶¶ 93-102. Shurb subsequently moved to voluntarily dismiss The Methodist Hospital, and the Court granted that motion. Docs. #54, #56.

The undisputed record also reflects that in Fall 2011, Shurb missed some exams because he was hospitalized. Shurb was required to provide his medical discharge summary to reschedule his exams, which he refused to do. After Shurb told University officials that his doctors suspected he tried to harm himself by drinking antifreeze, Shurb was also required to provide a certification from his psychiatrist that he was fit to return to school—which Shurb also refused to provide. As a result, Shurb did not reschedule his exams or complete his semester.

This case is controlled by the Fifth Circuit precedent, *Shaboon v. Duncan*, 252 F.3d 722 (5th Cir. 2001). Just like in *Shaboon*, Shurb's failure to address concerns regarding Shurb's fitness to perform as a medical student is a "sound academic basis" for the University's decision to withdraw Shurb as a student, and is not an act of disability discrimination or violation of Shurb's constitutional rights. Accordingly, summary judgment is warranted.

### III.    LIST OF SUMMARY JUDGMENT EXHIBITS

Defendants incorporate the following evidence attached hereto:

| Exhibit # | Description |
|---|---|
| **Exh. 1** | Jason Shurb Deposition Vol. 1 (hereafter, "**Shurb Depo**.") |
| **Exh. 2** | Declaration of Dr. Sheela Lahoti (hereafter, "**Lahoti Decl.**") |
| **Exh. 3** | 9/19/2009 Email chain from Cleary to Shurb (UTHealth000380) |
| **Exh. 4** | 10/19/2009 Email chain from Shurb to Zhang (UTHealth000991-92) |
| **Exh. 5** | 10/26/2009 Email chain from Cleary to Shurb (UTHealth000916-17) |
| **Exh. 6** | 8/18/2010 Email chain from Actor to Shurb (UTHealth001034-39) |
| **Exh. 7** | 9/17/2009 Email chain from Cleary to Shurb (UTHealth000872-73) |
| **Exh. 8** | 9/23/2009 Email chain from Clear to Shurb (UTHealth000871) |
| **Exh. 9** | 9/24/2010 Email chain from Lahoti to Shurb (UTHealth000619-20) |
| **Exh. 10** | 9/29/2010 Email chain form Shurb to Lahoti (UTHealth000601-04) |
| **Exh. 11** | 10/01/2010 Email chain from Actor to Shurb (UTHealth000863-864) |
| **Exh. 12** | 10/14/2010 Email chain from Felleman to Shurb (UTHealth000883) |

| Exhibit # | Description |
|-----------|-------------|
| **Exh. 13** | 11/3/2010 Email chain from Caver to Lahoti (UTHealth000853-54) |
| **Exh. 14** | 10/24/2010 Email chain from Shurb to Cleary (UTHealth000028-29) |
| **Exh. 15** | 11/30/2010 Email chain from Shurb to Lahoti (UTHealth000559-60) |
| **Exh. 16** | 12/1/2010 Leave Absence form and release (UTHealth000014-16) |
| **Exh. 17** | 5/31/2011 Davidson release letter (UTHealth000009) |
| **Exh. 18** | 9/15/2011 Email chain from Shurb to Lahoti (UTHealth000547) |
| **Exh. 19** | 9/29/2011 Email chain from Shurb to Lahoti (UTHealth000004) |
| **Exh. 20** | 10/7/2011 Email chain from Shurb to Lahoti (UTHealth000488) |
| **Exh. 21** | 11/7/2011 Letter from Jenkins to Cirkiel (Shurb021) |
| **Exh. 22** | 3/21/2012 Memorandum from Caver (UTHealth000011) |
| **Exh. 23** | 12/28/2010 Loan Statement (UTHealth000721-25) |

## IV.     STATEMENT OF FACTS

**A.     UTHealth's Accommodations for Shurb's Academic Difficulties in Fall 2009.**

Prior to attending UTHealth, Shurb was being treated by his physicians for various psychiatric health problems, including obsessive compulsive disorder ("OCD"), depression, anxiety, and panic attacks. Doc. #7 ¶ 25; **Shurb Depo**. 25:7-28:12. In his July 2008 self-assessment to his psychiatrist, Shurb described a "constant feeling of impending failure even if I have the highest grade in the class." **Shurb Depo**. 26:18-29:2. Shurb was prescribed various medications for his conditions, including Zoloft for depression and Klonopin for anxiety. *Id*. 32:3-20. Despite these psychiatric health disorders, Shurb was able to learn and graduated from Texas A&M University with a 4.0 grade point average. Doc. #7 ¶ 22.

Shurb began medical school at UTHealth in Fall 2009, and had difficulty with his Gross Anatomy class, taught by Dr. Len Cleary. **Lahoti Decl**.¶ 3. On September 9, 2009, during his first few weeks, Shurb emailed the Dr. Cleary regarding availability of a PowerPoint presentation of Dr. Cleary's lecture. **Exh. 3**. Dr. Cleary responded to Shurb within 10 minutes

with instructions on how to access the presentation. *Id.* Despite having access to the presentations, Shurb failed his Gross Anatomy "block 1" exam. **Lahoti Decl**.¶ 3. In medical school, the exams for courses are divided into three "blocks" of exams through the semester, followed by a final. *Id.* ¶ 2.

After receiving his failing grade, Shurb met with three people for guidance and advice. **Shurb Depo.** 47:5-11. He met with his professor, Dr. Cleary, who recommended reading additional material and using a peer tutor. *Id.* 49:7-24. He met with another Gross Anatomy professor, Dr. David Marshak, for additional guidance. *Id.* 47:12-17. He also met with Dr. Sheila Lahoti, the Assistant Dean for Admissions and Student Affairs, and they discussed study strategies and the availability of tutors. **Lahoti Decl**.¶ 3.

Shurb was assigned a second-year student as a peer tutor. **Shurb Depo.** 49:25-50:6. He testified that he tried contacting his tutor, and the person did not contact him back. *Id.* 50:4-5. Shurb did not request a different peer tutor. The Medical School also offered a special review session presented by Dr. Han Zhiang, another Gross Anatomy faculty member, in advance of the next Gross Anatomy block exam, which Shurb attended. **Exh. 4**. Shurb still failed his Gross Anatomy block 2 exam. **Lahoti Decl**.¶ 3.

After failing his block 2 exam, Shurb emailed Dr. Cleary asking for "serious counseling," stating that his grade was "causing me some serious clinical depression" and that he felt "rather desperate," but he did not ask for any specific accommodation. **Exh. 5**. Dr. Clearly responded that "part of what you have to learn in medical school and residency is how to respond to this kind of adversity." *Id.* Dr. Cleary then advised Shurb on different options for continuing for course, or entering the "Alternate Pathway" program. *Id.*

The Alternative Pathway is a program in the Medical School that allows students to split

the first year medical school curriculum into two years.  This program is offered to any Medical School student who wishes to take advantage of it. **Lahoti Decl**.¶ 4. Shurb chose to enter the Alternative Pathway program, and was withdrawn from two courses that semester, including Gross Anatomy. *Id.* He continued with half of the first-year curriculum in the 2009-2010 academic year, and was permitted to complete the rest of the first-year curriculum in the 2010-11 academic year.  Mr. Shurb passed his other classes in the 2009-2010 academic year. *Id.*

**B.      UTHealth's Accommodations for Shurb's Academic Difficulties in Fall 2010.**

Shurb began the second half of his first-year curriculum in Fall 2010, including restarting Gross Anatomy. At the beginning of the semester, an advisor, Dr. Jeffrey Actor, had a meeting with his advisory group of first-year students that included Shurb. **Exh. 6**; **Shurb Depo.** 101:7-18. Dr. Actor provided his advisory group with a handout at the meeting (and again afterwards in an email) that listed various academic help resources for the students, including:

- Learning Specialist Pam Bass, who was available "to help students with study skills, time management, and other learning issues";

- Peer tutoring;

- Confidential counseling services for "the stresses and strains of medical school and your personal life."

**Exh. 6**, at 1036-37. The last page of the handout also sets forth the policy for requesting an excused absence from a test, which makes it clear that Office of Student Affairs must approve and determine eligibility to sit for reexamination. *Id.* at 1039.

On September 17, 2010, shortly after beginning his Gross Anatomy class again, Shurb emailed Dr. Cleary about missing the block 1 review session, and stated, "I think just knowing that this go around at passing Gross is my final shot has my stress level at the highest I've ever known has my brain doing things that can't be controlled. I'm on 2 different antiseizure medications, a very high dose of antidepressants, a high dose of high blood pressure meds to

sleep, another med to control my panic attacks, plus triptans for the acute attacks. Lord knows how all those mix, hopefully after this semester, I will have a P next to Gross Anatomy and possibly start titrating off some of those." **Exh. 7**. He asked if the review session was going to be recorded (it was), and if he could get the PowerPoint presentation (and Dr. Cleary agreed). *Id*.

In early Fall 2010, Shurb complained to his doctor about having migraines, and was prescribed the drug Topamax to be slowly increased to 100 milligram doses. **Shurb Depo.** 70:3-15; 72:7-11. Shurb ended up choosing to double his dosage to 200 milligrams a day for a week, despite the side effects of "depression and suicidal ideation." *Id*. at 72:18 – 73:21.

Shurb failed his Gross Anatomy block 1 exam again, and on September 23, 2010, Shurb emailed Dr. Cleary about remediating the course at another institution. **Exh. 8**. Shurb stated, "I studied my ass off for this last exam and did not do well at all, and this has thrown me into a very deep depression." *Id*. Dr. Cleary responded by providing advice regarding remediation, indicated he was willing to meet with Shurb, and further directed Shurb to Pam Bass, the Medical School's learning specialist who assisted students. *Id*. Shurb never contacted Pam Bass.[2]

The following day, September 24, 2010, Shurb also emailed Dr. Marshak and Dr. Lahoti regarding his failing the Gross Anatomy block one exam. **Exh. 9.** Shurb stated, "You can't realize how frustrated and severely depressed I am about my life and passing this godforsaken class. … I am seeing a psychiatrist and am on very heavy drugs to control my anxiety, OCD, and panic attacks which this year anatomoy [sic] has now successfully been able to surpass their ability to suppress." *Id*. at 620-21. He suggests "this school's version of gross is incompatible with me," and that there "must be some cheating going on" by others in the class. *Id*. at 620. In response, Dr. Lahoti offers to meet with Shurb, and provides Shurb her personal number in case

---

[2] **Shurb Depo.** 63:16-20; 81:17-19. Although Shurb claims Pam Bass was not mentioned in any of the materials he received, his testimony is directly contradicted by both the email from Dr. Actor to Shurb (**Exh. 6**) and by Dr. Cleary's email to Shrub (**Exh. 8**).

he needed to contact her over the weekend. *Id*. at 619.

On September 27, 2010, Shurb met with Dr. Lahoti and Dr. Cleary on September 27, 2010, and afterwards sent an email to them with the subject line: "Offended and Expectant of an Apology." **Exh. 10**, at 604. Shurb claimed that Dr. Cleary showed him "gross insensitivity" and "disrespect" in front of Dr. Lahoti by accusing Shurb of "not wanting to learn the material." *Id*. Dr. Lahoti responded, "I must admit that I was under the impression that he meant that you might have a block in terms of learning the information," and offered to assist Shurb in getting an appointment with a neurologist regarding his migraines. *Id*. With Dr. Lahoti's assistance, Shurb was able to get an appointment with Dr. Wolinsky, a UTHealth faculty member. *Id*. at 601. Shurb responds with appreciation, calling Dr. Lahoti a "miracle worker." *Id*.

In addition to Drs. Cleary, Lahoti, and Marshak meeting with Shurb, other faculty members provided help and guidance to Shurb. On October 1, 2010, Dr. Actor offered to meet with Shurb about Gross Anatomy to discuss "on strategies that [Shurb] will take to help stay on track and improve your score for that course." **Exh. 11** at 864. Shurb responded that he was in a "very deep depression" and that he was combining hard alcohol with his array of medications:

> I must tell you when I saw that grade it threw me for a loop and I feel into a very deep depression and almost couldn't pull myself out of it, and I already am on the max dose of antidepressants, anxiety medications, and sleeping meds. It wasn't a good week for me. But tacking on that 16 yr single malt did help a bit.

*Id*. at 863. Dr. Actor responded by suggesting a time to meet with Shurb, and recommending that Shurb "keep away" from alcohol for a while. *Id*.

Shurb also requested to meet with another faculty member, Dr. Dan Fellemen, prior to the block 2 exam to review material, and Dr. Fellemen agreed to assist Shurb. **Exh. 12**. After having met with at least five faculty members regarding his performance, Shurb emailed Dr. Colasurdo, Dean of the Medical School, asking for advice as to how to pass Gross Anatomy, and

stating that his performance had "thrown [Shurb] into a deep depression." **Exh. 13**. Dr. Colasurdo forwarded Shurb's email to Dr. Lahoti, requesting that she help Shurb, to which Dr. Lahoti agreed. *Id*.

Nowhere in these several emails does Shurb identify himself as disabled, or request any specific accommodation for any disability—he merely asked for advice and an opportunity to meet. **Exhibits 7-13**.

Before the Gross Anatomy block 2 exam, Dr. Cleary held a review session with exam review questions. **Exh. 14**. On October 22, 2010, three days before the exam, Shurb requested the PowerPoint presentation from the review session. *Id*. at 29. Dr. Cleary explained because he did not want the exam review questions "in general circulation," the presentation slides were not available—but Shurb could view the lecture slides from the streaming video that was available. *Id*. at 28-29. Shurb did not indicate he needed the slides as an accommodation for any disability, except to say that he was a "visual learner." *Id*. Shurb admits that these October 2010 exam review slides were the only slides could recall not being provided. **Shurb Depo**. 121:7-18.

Before the block 2 exam, Shurb tried to hire a tutor named Jorge Noro to help him, offering Noro $1,000 if he passed Gross Anatomy. **Shurb Depo.** 79:19-25. However, Shurb later told Noro there was not sufficient time for Noro to help him with everything else Shurb had to do, so that they should defer tutoring until the third block. *Id*. 117:10-16.

Shurb failed the Gross Anatomy block 2 exam, and afterwards contacts Dr. Lahoti about meeting to discuss taking a remedial anatomy course over the summer. **Exh. 15** at 560. Shurb writes, "I have lost complete faith in this school," and threatens to go to "the Board of Regents or Rick Perry, the governor whom I know through his daughter." *Id*. On November 29, 2010 Dr. Lahoti responds by offering to meet that day, to which Shurb expresses appreciation. *Id*. at 559.

After consulting with Dr. Lahoti and his mother, on December 1, 2010 Shurb took a medical leave of absence from the Medical School. Doc. #7 ¶ 36; **Exh. 16** (Leave of Absence form). Shurb was granted the medical leave of absence from December 1, 2010 until August 2011, with the required re-entrance procedure that he have a psychiatric evaluation and that he follow up with his psychiatrist's recommendations. **Exh. 16**. Shurb agreed to the terms and signed the Leave of Absence form and release of medical information to the University. *Id*. at 14, 16. On May 31, 2011, Shurb's psychiatrist, Dr. Joyce Davidson, provided a release for Shurb to return to the Medical School in Fall 2011. **Exh. 17** (Davidson release letter).

### C. Shurb's September 2011 Hospitalization and Failure to Provide Medical Documentation to Return to School.

Mr. Shurb resumed classes in Fall 2011, and started Gross Anatomy for the third time. **Lahoti Decl.** ¶ 6. On or about September 10, 2011, Shurb "started convulsing," "couldn't even drink water," and "was in the hospital throwing up blood." **Shurb Depo.** 157:19-23. Shurb testified he "might have had a drink" but was not "drinking heavily at this time," and had not ingested anything he knew to be poisonous prior to his hospitalization at Methodist Hospital. *Id*. 158:21-159:4, 160:6-9. He has no explanation for his medical condition. *Id*. 160:10-12.

Shurb testified that his treating physician, Dr. Sara Waters, accused him of drinking anti-freeze as an explanation for his condition, which Shurb denied. *Id*.161:2-162:3. Later during his hospitalization, two medical students on a psychiatric rotation came to see him, and said, "I understand you tried to commit suicide." *Id*. 168:4-10. Shurb and his mother got verbally upset, and his mother chased them out of the room. *Id*. 168:11-17.

On or about September 15, 2011, Shurb emailed Dr. Lahoti, saying he was being hospitalized for multiple days at Methodist Hospital, and asked about rescheduling exams he would miss in Gross Anatomy and Histology. **Exh. 18**; **Lahoti Decl**. ¶ 6. Dr. Lahoti informed

Shurb that for him to be allowed to reschedule those exams, he needed to provide documentation regarding his hospitalization. **Lahoti Decl.** ¶ 6. Shurb only emailed a photo of his hospital armband, and photos of select portions of his medical discharge. *Id*. Dr. Lahoti indicated this was insufficient documentation. *Id*. Shurb testified he deliberately omitted portions from the photos of his medical discharge that he considered his private medical information. **Shurb Depo.** 176:1-15. He later told University officials to "contact Methodist Hospital" directly to get the documentation they needed, but he never gave the University any release for his medical records at Methodist Hospital. *Id*. 184:6-21.

On September 29, 2011, Shurb forwarded Dr. Lahoti an email from one of his treating physician, Dr. Terry McLendon, stating the dates that Shurb was hospitalized. **Exh**. **19.** Dr. McLendon's email also contained a recommendation for an outpatient appointment with Shurb's psychiatrist. *Id*.; **Lahoti Decl.** ¶ 7. Dr. Lahoti still considered this to be insufficient documentation to reschedule Shurb's exams. *Id*.

On or about October 7, 2011, Shurb forwarded Dr. Lahoti an email exchange with his Gross Anatomy professor, Dr. Cleary, asking about when he could make up his exam. **Exh. 20**. Shurb stated in the email, "I thought I would be back to normal by now, but I just seem to be getting weaker and weaker." *Id*. Dr. Cleary explained to Shurb that Student Affairs needed to clear him to take his makeup exam—and in turn, Shurb asked Dr. Lahoti about what he needed to provide to get clearance. *Id*.

On the same day, Dr. Lahoti and Dr. Margaret McNeese responded to Shurb by meeting with him to explain the need for a discharge summary to excuse his exam absence. **Lahoti Decl.** ¶ 9. At that meeting, Shurb informed Drs. Lahoti and McNeese that his treating physicians at Methodist Hospital were concerned that he had intentionally harmed himself by drinking

antifreeze. *Id.*; **Shurb Depo**. 193:10-21 ("I told them that a resident physician just accused me of trying to take anti-freeze."). While Shurb believes Dr. Lahoti somehow already knew this, Dr. Lahoti had no prior knowledge of any accusation that Mr. Shurb had attempted to harm himself. **Lahoti Decl.** ¶¶ 9-10.

Because of Shurb's statements at the October 7 meeting, Drs. Lahoti and McNeese determined that Shurb also needed to provide a certification from his psychiatrist that he was not a danger to himself or others, and was fit to return to class. *Id.* ¶ 11. Shurb did not provide this information—and instead on October 10, 2011, Shurb sent an email to his psychiatrist, Dr. Davidson, revoking the University's previously-granted access to his medical information. **Shurb Depo.** 197:13-17.

Dr. Lahoti and Patricia Caver (Director of Admissions and Student Affairs) repeatedly tried to discuss with Shurb the need to provide the discharge summary and the certification from his psychiatrist, but Shurb continued to refuse to provide them to the University. **Lahoti Decl.** ¶ 12. Instead, Shurb hired a lawyer, Martin Cirkiel, who wanted to be present at future meetings between Shurb and University officials. **Exh. 21**. A University Senior Legal Officer wrote back to Shurb's lawyer, explaining again that all Shurb had to provide was the "discharge summary" and "certification from his treating psychiatrist that Mr. Shurb is not a danger to himself or others and is 'fit' to return to the rigorous academic regimen required of all medical students." *Id.* Shurb never provided these documents. **Lahoti Decl.** ¶ 12.

As a result of Shurb's failure to provide this documentation, he was not permitted to reschedule taking his missed exams, and he did not complete his semester at the Medical School. *Id.* A grade of "Withdrawn" was entered for his Fall 2011 courses. *Id.*; **Exh. 22**. About a year later, Shurb filed this lawsuit. Doc. #1.

### IV.     ARGUMENT AND AUTHORITY

**A.     Summary Judgment Standard**

Summary judgment should be granted if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* FED. R. CIV. P. 56. The party seeking summary judgment is not required to produce evidence showing the absence of a genuine issue of material fact, but can satisfy its burden by pointing out to the court that there is an absence of evidence to support the nonmoving party's case. *See Celotex*, 477 U.S. at 325. Once the defendant had met his burden, the plaintiff may not rest on unsubstantiated allegations in his pleadings, but must produce competent, tangible evidence to survive summary judgment. *Id.*

**B.     Shurb Cannot Establish the Elements of his ADA and Rehabilitation Act Claims.**

**1.     Statutory Background on the ADA and Rehabilitation Act.**

Title II of the ADA provides that "[s]ubject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The Rehabilitation Act similarly provides that "no otherwise qualified individual with a disability in the United States, ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance …." 29 U.S.C. § 794(a).

To establish a claim under Title II of the ADA or the Rehabilitation Act in "the context of a student excluded from an educational program," a plaintiff must prove that: (1) he has a

disability; (2) he is otherwise qualified to participate in the defendant's program; and (3) he was excluded from the program on the basis of his disability. *Maples v. University of Texas Medical Branch at Galveston*, 901 F.Supp.2d 874 (S.D.Tex. 2012), aff'd 524 Fed. Appx. 93 (5th Cir. 2013); *see also Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011).

"The only material difference between the [ADA and the Rehabilitation Act] lies in their respective causation requirements." *Bennett–Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005) (citation omitted). The Rehabilitation Act imposes a stricter "sole cause" test for causation, while the ADA establishes a "motivating factor" causation test." *Id.*; *see also Maples*, 901 F. Supp. 879. Under both the ADA and the Rehabilitation Act, a plaintiff "may only recover compensatory damages upon a showing of intentional discrimination" based on the plaintiff's disability. *Delano–Pyle v. Victoria County, Tex.*, 302 F.3d 567, 574 (5th Cir. 2002). "There is no 'deliberate indifference' standard applicable to public entities for purposes of the ADA or the [Rehabilitation Act]." *Id.* at 575. Here, Shurb has no evidence of discriminatory animus.

Under the implementing regulations for both the ADA and the Rehabilitation Act, discrimination by a public entity also includes failing to make "reasonable accommodations" to the disabled individual, so that he can participate in the programs provided by the public entity. *See* 28 C.F.R. § 35.130(b)(7); 34 C.F.R. § 104.44(a). However, the plaintiff bears the burden of requesting reasonable accommodations. *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 n.4 (5th Cir. 1999). If a plaintiff makes a valid request for reasonable accommodations, the public entity has an obligation to engage in an "interactive process" to determine the best means of accommodating the plaintiff's disability. *Id.* at 735; *see also Aragona v. Berry*, 2012 WL 467069, at *10 (N.D.Tex. Feb. 14, 2012). "The ADA provides a right to reasonable accommodation, not

to the [plaintiff's] preferred accommodation." *E.E.O.C. v. Agro Distribution, LLC*, 555 F.3d 462, 471 (5th Cir. 2009).[3]

## 2. To the Extent Shurb Bases a Claim on a Purported "Visual Learner" Disability, He Cannot Establish the Elements of That Claim.

Shurb alleges he is a "visual learner" and that he suffers various psychiatric disorders: "Obsessive Compulsive Disorder, Severe Anxiety … Major Depressive Disorder and a history of migraines." Doc. #7 ¶ 25. Shurb was diagnosed early on with depression and OCD, but this apparently did not substantially impair his learning or prevent him from graduating from Texas A&M with a 4.0 GPA. **Shurb Depo**. 25:7-26:4; Doc. #7 ¶ 22. However, even assuming for summary judgment purposes that Shurb's psychiatric disorders are qualifying "disabilities," Shurb's claim that he is a "visual learner" is not a "disability"—and in any event, he was not denied reasonable accommodation or discriminated against on this basis.

Shurb actually testified he did not consider being a visual learner to be a "disability," as opposed to recognition that he simply "learn[s] best visually." **Shurb Depo.** 123:18-25, 124:17. However, because on one occasion in October 2010, his professor Dr. Cleary declined to provide PowerPoint slides of an exam review session because it contained exam questions, Shurb alleges failure to accommodate and disability discrimination. *Id.* 120:21-123:25 ; Doc. #7 ¶ 28-29. Shurb admits that the October 2010 exam review PowerPoint slides were the only slides could recall not being provided. **Shurb Depo.** 121:7-18.

There is no evidence that Shurb being a "visual learner" is an impairment that "substantially limits a major life activity," and thus it cannot be a "disability" that could be the

---

[3] Under Rehabilitation Act regulations for post-secondary educational institutions, "[a]cademic requirements that the [educational institution] can demonstrate are essential to the instruction being pursued by such student or to any directly related licensing requirement will not be regarded as discriminatory …." 34 C.F.R. § 104.44(a) (Rehabilitation Act regulations). Similarly, the Title II regulations do not require modifications that "would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

basis of an ADA/Rehabilitation Act Claim.[4] 42 U.S.C. § 12102(1); *E.E.O.C. v. Chevron Phillips Chemical Co., LP*, 570 F.3d 606, 614 (5th Cir. 2009). Moreover, Shurb did not identify being a "visual learner" as being a disability that he suffered to Dr. Cleary when requesting the lecture slides. **Exh. 14**.

Further, even if being a "visual learner" were a disability, and was identified as such to the University, Shurb's professor engaged in an "interactive process" to attempt to assist Shurb. *Aragona*, 2012 WL 467069, at *10. Dr. Cleary had previously assisted Shurb with access to online lecture PowerPoint files, and pointed out that while the October 2010 review were not generally available because they contained exam review questions, Shurb could still view the slides from the streaming video of the exam review class, if necessary. **Exhibits 3, 14**. The University is not required to provide Shurb the "best" accommodation or Shurb's preferred accommodation; the University is only required to provide a "reasonable accommodation." *Agro Distribution,* 555 F.3d at 471. Shurb's demand to be provided PowerPoint slides containing exam review questions just before an exam is not a reasonable accommodation request, and there is no showing in any intentional discrimination in refusing his demand. Finally, any claim related to the October 2010 PowerPoint would be barred by the applicable two-year statute of limitations. *Frame v. City of Arlington*, 657 F.3d 215, 237 (5th Cir. 2011).

### 3.   Shurb Cannot Establish That He Was a "Qualified Individual" With Respect to His Continuation in Medical School.

Assuming *arguendo* that Shurb's mental health disorders are "disabilities," Shurb was not qualified to continue enrollment in the Medical School because he had missed key exams for health reasons, and refused to provide necessary documentation to reschedule those exams.

---

[4] "Simply having an impairment is insufficient to make one disabled under the statute; a plaintiff must also show that the impairment substantially limits a major life activity." *Garner v. Chevron Phillips Chem. Co*., 834 F.Supp.2d 528, 537 (S.D.Tex. 2011).

As the Fifth Circuit recognized in *Shaboon v. Duncan*, 252 F.3d 722 (2001), the dismissal of a medical student due to concerns about the student's mental health and fitness to perform as a doctor, combined with the student's lack of cooperation and failure to provide a certification of fitness from a treating psychiatrist, constitutes a "a sound academic basis for [the student's] dismissal." *Id.* at 731. The court's holding in *Shaboon* is directly on point:

> [T]he undisputed facts indicate that the Health Science Center dismissed Shaboon for reasons related to her fitness to perform as a doctor. … No psychiatrist ever cleared Shaboon to return to work, and Shaboon missed clinical rotations as a result. Although Shaboon's intransigence might suggest that her dismissal was disciplinary, her refusal to acknowledge and deal with her problems ***furnished a sound academic basis*** for her dismissal. As a matter of law, therefore, Shaboon was not entitled to any type of hearing and cannot claim that Dr. Duncan violated a liberty interest in her residency.

*Id.* at 731 (emphasis added). The same is true here, as Shurb's refusal to address the University's concerns by providing the requested information regarding his fitness to return to the rigorous academic regime required of all medical students "furnished a sound academic basis" for his withdrawal from the program.

After Shurb himself raised the concerns regarding his health at the October 7, 2011 meeting, the University required that he provide his discharge summary and a certification from his treating psychiatrist. **Lahoti Decl**. ¶¶ 9, 11. The summary judgment record is undisputed that he did not provide those documents to the University—and instead he made efforts to revoke any access the University had to his medical records. **Shurb Depo.** 197:13-17. Shurb admitted that he did not even attempt to obtain a certification to provide the University because he "did not feel that that was necessary." *Id*. 19:15-20:1. The summary judgment record further shows that because he did not provide the requested documentation, he was not eligible to reschedule his exams and remain enrolled in the Medical School. **Exh. 6** at 1039; **Exh 21-22**. Accordingly, Shurb is not "qualified" to remain a student.

Once UTHealth has presented some evidence that Shurb was not qualified to remain a student, the burden shifts to Shurb to produce evidence to demonstrate that a reasonable accommodation existed, that he requested it, and that this accommodation "would enable [him] to meet the educational institution's minimal requirements." *Wong v. Regents of the University of California*, 192 F.3d 807, 817 (9th Cir.1999) (*citing Zukle v. Regents of the University of California,* 166 F.3d 1041, 1047 (9th Cir.1999). Shurb has produced no such evidence, and cannot maintain his disability discrimination claim.

### 4.    Shurb Cannot Established He Was Intentionally Discriminated Against Because of Any Disability.

For similar reasons as discussed above, rather than intentionally discriminate against Shurb because of his alleged disabilities, Shurb was withdrawn from the University for reasons the Fifth Circuit has identified as being consistent with "sound academic basis" for dismissal. *Shaboon*, 252 F.3d at 731. The actions taken with respect to his withdrawal are related to his failure to provide a discharge summary and a certification of fitness to return to medical school, not because of any animosity towards any perceived disability.

Indeed, Shurb alleges that the University was aware that Shurb had depression issues as early as 2009. Doc. #7, ¶ 27; *see also* **Exh. 5**. However, instead of discriminating against him, University officials tried repeatedly to assist him with his difficult Gross Anatomy class though: 1) meetings and counseling from at least five different faculty members, 2) the Alternative Pathway program, 3) referrals to tutors, and 4) granting a medical leave of absence. **Exhibits 3-17**. These extensive attempts to help a student with his academic difficulty are inconsistent with any intentional discrimination on the basis of any disability.

**5.      Shurb Cannot Establish a Failure to Reasonably Accommodate Him.**

Notably, the only clear allegations in the Amended Complaint related to any specific denial of accommodation refer to the October 2010 PowerPoint presentation with exam review questions (which is addressed in detail *supra*). Doc. #7 ¶¶ 29-30. There is no allegation—nor any evidence—that Shurb ever requested any accommodation in connection with any alleged disability following his hospitalization in Fall 2011, and there is no evidence that the denial of any such accommodation led to his withdrawal from participating in the program.

The summary judgment record does not establish the basic elements of a failure-to-accommodate claim, and instead establishes that the University went well beyond an "interactive process" required by the ADA and the Rehabilitation Act, trying repeatedly over several years to assist Shurb in passing his difficult Gross Anatomy class. **Exhibits 3-17**. Shurb was passing all his other classes, and his inability to pass Gross Anatomy is not a failure to accommodate.

**6.      Shurb Cannot Establish Any Retaliation Claim.**

Shurb alleges "retaliation" from the University in the form of the University trying to collect on a $5,000 Perkins loan. Doc. #7 ¶¶ 74-77, 82. Shurb puts forward no evidence of any unlawful acts of retaliation, nor any motivation linked to any protected activity. Shurb admits that he took out a $3,000 deferred loan from the University in connection with attending medical school. **Shurb Depo**. 144:23–146:17; **Exh. 23** (loan statement). He does not dispute it was not paid back after his withdrawal from the University. **Shurb Depo.** 170:25–171:18. While Shurb may not want to pay back his loan, the University's attempts to collect are not retaliation.

**C.      Shurb Cannot Establish the Elements of his Procedural Due Process Claim.**

Shurb alleges a constitutional procedural due process violation because the Individual Defendants failed to provide him a hearing prior to his withdrawal from the Medical School.

Doc. #7 ¶ 124. Shurb also asserts a procedural due process violation in University officials requiring that he provide medical documentation to reschedule his exams and continue in the program—in purported violation of unspecified University policies. *Id.* ¶¶ 64, 123.

Federal courts have assumed (without deciding) that a disciplinary or academic dismissal from a public university affects the student's constitutionally protected interest in continued enrollment.[5] In the seminal case of *Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78 (1978), the Supreme Court was asked to determine whether a former medical student's due process rights had been violated upon her academic dismissal from the medical school of a public university. The *Horowitz* Court assumed, without deciding, that the dismissed student had a protected interest in continued enrollment. *Id.* at 85.

The *Horowitz* Court further held that due process does *not* require any formal hearing for university students subject to academic dismissals, but rather requires only that the student receive notice of the academic problems and a "careful and deliberate" decision by the institution. *Id.* Even in the context of disciplinary dismissals, which are subject to more scrutiny, due process requires at most "'an informal give-and-take' between the student and administrative body dismissing him that would, at least, give the student 'the opportunity to characterize his conduct and put it in what he deems the proper context.'" *Id.* at 86 (quoting *Goss v. Lopez*, 419 U.S. 565, 584 (1975)). The *Horowitz* Court made it clear that the courtroom is not the proper forum to second-guess academic decisions. 435 U.S. at 89-90.

Numerous Fifth Circuit opinions have followed *Horowitz* in holding that dismissed students who received notice of their academic problems and some sort of give-and-take

---

[5] For purposes of summary judgment, Defendants do not challenge that Shurb had a constitutionally-protected interest in continued enrollment, but reserve the right to challenge such an interest at later stages of this case, should that be necessary. *See, e.g., Bell v. Ohio State Univ.*, 351 F.3d 240, 249–51 (6th Cir. 2003) (holding that medical student's interest in continued enrollment not protected).

reflecting a deliberate decision-making process by the university were afforded all the process they were due. *See, e.g., Ceasar v. Holt*, 245 Fed. Appx. 396, 397 (5th Cir. 2007); *Shaboon v. Duncan*, 252 F.3d 722, 730-32 (5th Cir. 2001) (holding dismissed medical resident received all process that was due); *Wheeler v. Miller*, 168 F.3d 241, 248-49 (5th Cir. 1999); *Davis v. Mann*, 882 F.2d 967, 975 (5th Cir. 1989) (holding dismissed dental resident received all process due).

Here, Shurb was involuntarily withdrawn from the program only after the University's officials were made aware of the concerns of Shurb's treating physicians as to his mental health and stability, and after Shurb repeatedly failed to provide requested documentation regarding his hospital stay and mental health status. Doc. #7. ¶ 64-65, 69-70, 72; **Lahoti Decl.** ¶ 11-13. The Fifth Circuit has held that a medical school has a "sound academic basis" for dismissing a student with health concerns based on the student's failure to provide medical information and certifications of fitness from treating physicians and that, "as a matter of law," that student is "not entitled to any type of hearing." *Shaboon*, 252 F.3d at 731.

Moreover, even if Shurb's withdraw were considered dismissal for disciplinary reasons, "he is not entitled to a formal hearing but only to an 'informal give-and-take' with the school to have an 'opportunity to characterize his conduct.'" *Senu-Oke v. Jackson State University*, 283 Fed.Appx. 236, 240 (5th Cir. 2008) (quoting *Horowitz*, 435 U.S. at 86). The record shows that Shurb was afforded more than the requisite "informal give-and-take" with the University regarding the need to provide medical documentation to reschedule his exams, as reflected by numerous correspondence and meetings on the issue. Doc. #7 ¶¶ 64-70; **Exhibits 2, 20, 21**.

With respect to the alleged violations of University policy of procedure, Shurb has not and cannot identify any specific University policy or procedure that was violated by the requirement that he provide his medical discharge summary and certification of fitness.

Ironically, Shurb agreed without protest to provide a certification from his psychiatrist for him to be excused for his Fall 2010 medical leave of absence, but then refused when the University required something similar for his Fall 2011 medical absence. **Exhibits 16-17**.

In any event, a violation of a university's policies or procedures does not constitute a constitutional due process violation. "There is not a violation of due process every time a university or other government entity violates its own rules." *Levitt v. University of Texas at El Paso*, 759 F.2d 1224, 1230 (5th Cir. 1985). Moreover, given that the Fifth Circuit has held that such conditions are constitutional as a matter of law and do not violate any due process rights, Shurb cannot demonstrate a constitutional violation here. *Shaboon*, 252 F.3d at 731.

## D.   Shurb Cannot Establish the Elements of his Substantive Due Process Claim.

Shurb asserts that each of the Individual Defendants violated his substantive due process rights by denying him "equal access to all benefits and privileges of a public higher education." Doc. #7 ¶¶ 129-135. To establish a violation of the Fourteenth Amendment's guarantee of substantive due process, a plaintiff must prove that (1) he was deprived of a life, liberty, or property interest (2) in an arbitrary and capricious manner. *Moulton v. City of Beaumont*, 991 F.2d 227, 230 (5th Cir. 1993). In deciding whether a government action is arbitrary, courts look to whether the government action is "is rationally related to a legitimate governmental interest." *Simi Inv. Co., Inc. v. Harris County, Tex.*, 236 F.3d 240, 250-51 (5th Cir. 2000).

Shurb alleges—and the evidentiary record  reflects—that the Individual Defendants placed conditions on his continued participation in the program *after* concerns for his mental health were raised by his treating physicians. Doc. #7 ¶ 65; Lahoti Decl. ¶¶ 9-11. Shurb admits that, despite repeated requests, he refused to provide the requested documentation relating to his hospitalization and certifications from his psychiatrist. Doc. #7 ¶ 70. As a matter of law, the

dismissal of a medical student due to concerns about the student's mental health and fitness to perform as a doctor, combined with the student's lack of cooperation and failure to provide a certification of fitness from a treating psychiatrist, constitutes a "a sound academic basis for [the student's] dismissal." *Shaboon*, 252 F.3d at 731. Thus, the Individual Defendants' actions were rationally related to a legitimate governmental interest, and Shurb cannot establish a violation of his substantive due process rights.

**E.      Shurb Cannot Establish the Elements of his "Class of One" Equal Protection Claim.**

To state a claim under the Equal Protection clause of the Fourteenth Amendment, a plaintiff must allege "membership in a protected class that has been singled out for unequal treatment by the government." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985). In this case, Shurb alleges that he is a member of a "class of one." Doc. #7 ¶¶ 136-143. To maintain an equal protection claim as a class of one, a plaintiff must show he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." .*See Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

However, the Supreme Court has distinguish between a "class of one" claim where the government is exercising "the power to regulate or license, as lawmaker," versus where the government is acting "as proprietor, to manage [its] internal operation." *Engquist v. Oregon Dept. of Agr.*, 553 U.S. 591, 599 (2008). The Supreme Court went on to hold that "class-of-one theory of equal protection has no application in the public employment context." *Id.* at 607.

Numerous courts have applied the Supreme Court's reasoning in *Engquist* to preclude class-of-one claims in public university and academic contexts requiring discretionary decisions by state actors. *See, e.g., Heike v. Guevara*, No. 10–1728, 2013 WL 1092737, at **10 (6th Cir. Mar. 18, 2013) (dismissing claim by student athlete dismissed from team); *Nofsinger v. Virginia*

*Comm. Univ.*, No. 3:12–CV–236, 2012 WL 2878608, at *11 (E.D.Va. July 13, 2012) (holding "the public education context an equally poor fit for class-of-one equal protection claims due to the inherently discretionary decisionmaking that occurs there" and dismissing claim by graduate student); *Bissessur v. Ind. Univ. Bd. of Trustees*, No. 1:07-CV-1290, 2008 WL 4274451, at *9 (S.D. Ind. Sept. 10, 2008) (holding that "Supreme Court's rationale in *Engquist* effectively forecloses [plaintiff's] claim" relating to dismissal from optometry school), *aff'd* 581 F.3d 599 (7th Cir. 2009).

The same should hold true here as to the decisions made by the Individual Defendants related to Shurb's academic progress and fitness to continue in the program, which "by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments." *Engquist*, 553 U.S. at 603; *see also Horowitz*, 435 U.S. at 89-90 ("the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decision-making"). Like the numerous courts cited above, this Court should decline to recognize a class-of-one claim in the academic context.

Even if Shurb could bring a class-of-one claim in the academic context, Shurb has failed to meet the essential elements of that claim by showing that (1) he was "intentionally treated differently from others similarly situated" and (2) "that there [was] no rational basis for the difference in treatment." *Whiting v. Univ. of So. Miss.*, 451 F.3d 339, 348 (5th Cir. 2006) (quoting *Village of Willowbrook*, 528 U.S. at 564). As the Fifth Circuit has explained, any rational ground for the conduct in question will suffice to defeat a class-of-one claim. *Stotter v. University of Texas at San Antonio*, 508 F.3d 812, 824 (5th Cir. 2007).

Here, Shurb cannot identify any other similarly situated students who had also been hospitalized and whose treating physicians had expressed concerns regarding their mental health and safety. *See Fan v. Brewer*, 2009 WL 1743824 at *8 (S.D. Tex. June 17, 2009) (dismissing class-of-one claim by dismissed graduate student who failed to allege she was treated differently that other similarly situated students); *Retzlaff v. de la Vina*, 606 F.Supp.2d 654, 658 (W.D. Tex. 2009) (dismissing class-of-one claim where plaintiff failed to show he was treated differently than similarly-situated individuals).

Moreover, the evidence shows that the Individual Defendants had a rational basis for their actions—that is they were concerned about Shurb's mental health, whether he was a danger to himself and others, and whether he was otherwise fit to continue as a medical school student. *See Shaboon*, 252 F.3d at 731 (holding concerns of medical student's mental health and fitness to practice constituted rational basis for dismissal). Accordingly, because Shurb cannot raise a fact issue regarding the essential elements of a "class of one claim," that claims should be dismissed.

## V.    CONCLUSION

Defendants respectfully request that the Court dismiss Plaintiff's suit with prejudiced.


DATE: June 30, 2014                                 Respectfully submitted,

                                                    GREG ABBOTT
                                                    Attorney General of Texas

                                                    DANIEL T. HODGE
                                                    First Assistant Attorney General

                                                    DAVID C. MATTAX
                                                    Deputy Attorney General for Defense
                                                    Litigation

                                                    JAMES "BEAU" ECCLES
                                                    Division Chief - General Litigation

/s/ Drew L. Harris_____
**DREW L. HARRIS**
State Bar No. 24057887
Southern District ID No. 1114798
Drew.Harris@texasattorneygeneral.gov
Assistant Attorney General
Office of the Attorney General
General Litigation Division -019
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120  //  (512) 320-0667 FAX

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to:

Jason J. Bach
The Bach Law Group PLLC
jbach@bachlawfirm.com
*Attorney for Plaintiff*

Dwight W. Scott, Jr.
Scott Patton PC
dscott@scottpattonlaw.com
*Attorney for Defendant The Methodist Hospital*

/s/ Drew L. Harris_____
**DREW L. HARRIS**