UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JASON SHURB, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:13-CV-271 |
| | § | |
| THE UNIVERSITY OF TEXAS HEALTH | § | |
| SCIENCE CENTER AT HOUSTON-SCHOOL | § | |
| OF MEDICINE, *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

**I.     INTRODUCTION**

Pending before the Court is the defendants', The University of Texas Health Science Center at Houston (the "University"), and Dr. Guiseppe N. Colasurdo ("Dr. Colasurdo"), Dr. Margaret C. McNeese ("Dr. McNeese") and Patricia E. Caver ("Carver"), in their official capacities, (the "individual defendants") (collectively, the "defendants"), motion for summary judgment (Dkt. No. 69). The plaintiff, Jason Shurb (the "plaintiff"), has filed a response in opposition to the motion (Dkt. No. 75) and the defendants have filed a reply (Dkt. No. 76). After having carefully considered the motion, response, reply, the record and the applicable law, the Court determines that the defendants' motion for summary judgment should be GRANTED.

**II.    FACTUAL BACKGROUND**

This case concerns treatment that the plaintiff received while he was a medical student at the University. The plaintiff began medical school at the University in the fall of 2009. He claims that he experienced obsessive compulsive disorder, severe anxiety leading to occasional panic attacks, major depressive disorder, and has a history of migraines. He alleges that, due to those medical problems, and upon the advice of University administrators, he participated in the

University's Alternative Pathway program, which splits the first year of medical school into two years.

The plaintiff claims that he is also a visual learner and benefits from visual aids and resources for retaining information and studying for examinations. He alleges that all of his professors, except for Dr. Leonard J. Cleary, his Gross Anatomy professor, provided him access to visual aids, resources, and presentations both inside and outside of the classroom. The plaintiff contends that in the fall of 2010, he sent several emails to Dr. Cleary, requesting access to PowerPoint lecture presentations from the class to provide the visual reinforcement he needed, but Dr. Cleary refused. He claims that Dr. Cleary continued to refuse his request even after he explained that he was a visual learner and had received visual accommodations from other professors.

The plaintiff asserts that in October of 2010, he contacted Dr. Colasurdo, University President and Dean of the medical school, for assistance in obtaining the visual aids, but Dr. Colasurdo did not respond to his emails. Although Dr. Colasurdo subsequently directed the plaintiff to the Office of Student Affairs, the plaintiff claims that he failed to address his accommodation requests.

The plaintiff alleges that the lack of accommodation caused his anxiety to worsen and he started experiencing blinding migraines. Therefore, he took a medical leave of absence for the fall of 2010, upon the advice of Dr. Sheela L. Lahoti, Assistant Dean for Admissions and Student Affairs.

The plaintiff contends that the University required him to follow up with his treating psychiatrist, Dr. Joyce Davidson, and to provide a letter from her and/or his other treating

physicians that he was fit to resume classes. He alleges that Dr. Davidson subsequently provided a letter clearing him to resume classes the following fall.

According to the plaintiff, after resuming classes in the fall of 2011, he became "severely ill, convulsing, unable to walk without assistance, and unable to drink even water without vomiting." After visiting a 24-hour Urgent Care Center, the plaintiff was admitted to Methodist Hospital. He claims that, while at the hospital, he was required to speak with a psychiatrist other than his own and the treating physician, Dr. Lindsay Waters, falsely accused him of attempting suicide by drinking antifreeze. The plaintiff also asserts that rumors "began to spread to other residents, students, and apparently all the way back to the University, that [he] allegedly inflicted his condition upon himself." The plaintiff "believes" that Dr. Waters improperly communicated with the University regarding his confidential educational, medical, and mental health records.

The plaintiff alleges that his mother contacted Ms. Caver, the University's Director of Admissions and Student Affairs, and informed her that he would be in the hospital for an unknown period of time. He claims that the University wished him well and voiced no concerns regarding his absence.

After being released from the hospital, the plaintiff contacted Dr. Lahoti about returning to classes. Dr. Lahoti requested a medical release form and a note from the plaintiff's treating physician. The plaintiff asserts that he provided some documentation about his hospitalization to the University and, believing that he had clearance to do so, attended classes from September 21, 2011 to October 7, 2011.

The plaintiff asserts that on October 7, 2011, he was "abruptly and involuntarily" escorted out of class by a representative from the Office of Student Affairs, where Dr. McNeese, Associate Dean for Admissions and Student Affairs, Dr. Lahoti and Ms. Caver were waiting for

him. He claims that the administrators ordered him to submit to the following additional conditions before he could resume classes: (1) disclose his full medical record from the hospital and the 24-hour Urgent Care Center; (2) attend follow-up appointments with his psychiatrist and other treating physicians and provide a certification from his psychiatrist that he was not a danger to himself or others and was fit to resume classes; and (3) execute several authorization forms permitting the University to obtain disclosure of his protected health information. The plaintiff alleges that Dr. McNeese told him the measures were required to protect the faculty and students from him. He "believes" that Dr. Lahoti changed her mind about his clearance to resume classes because of, *inter alia*, an "unauthorized contact from the Hospital stating something untrue or misleading."

On October 10, 2011, the plaintiff and his mother met with Dr. McNeese, Dr. Lahoti, and Ms. Caver. The plaintiff claims that once his mother took out a tape recorder in an effort to record the meeting, the administrators refused to continue the meeting without legal representation, which was unavailable at the time. The plaintiff claims that he and his mother then met with Dr. Colasurdo who informed them that he left "such situations to the Student Affairs Office" and instructed his assistant to arrange a meeting with the University's legal counsel.

The plaintiff contends that on October 11, 2011, he and his mother met with Attorney David Jenkins from the University's Office of Legal Affairs. The plaintiff claims that when Attorney Jenkins was informed of the "full medical record disclosure" condition that was placed upon him, Jenkins "seemed surprised" and said there must have been some misunderstanding. Jenkins then instructed the plaintiff to obtain a discharge summary from the hospital and a report from his psychiatrist that he was not a danger to himself or others before resuming classes. The

plaintiff admits that he did not provide the requested information, but claims that he believed it was a violation of his rights and was unreasonable and "grossly overbroad."

On December 22, 2011, Caver, believing that the plaintiff had not complied with the University's requests, sent a letter to Attorney Jenkins that the plaintiff would be assigned grades of "withdraw" for the fall 2011 semester and that he would be withdrawn from the University. The plaintiff further alleges that the University retaliated against him by demanding payment of a $5,000 Perkins loan he was awarded for the 2011-2012 academic year.

Consequently, on February 4, 2013, the plaintiff initiated the instant action against the University under § 504 of the Rehabilitation Act of 1973 (the "Rehabilitation Act"), Title II of the Americans with Disabilities Act ("ADA") and Chapter 321 of the Texas Health and Safety Code. He also asserts claims against the University for breach of contract, intentional infliction of emotional distress and negligent hiring. With regard to the individual defendants, he alleges claims for intentional infliction of emotional distress and violations of his procedural and substantive due process rights as well as his equal protection rights. On August 13, 2013, this Court granted in part and denied in part the defendants' motion to dismiss the plaintiff's claims. (Dkt. No. 30). The plaintiff has since abandoned all of his constitutional claims and now solely alleges claims under the Rehabilitation Act and the ADA against the University. Therefore, in light of the plaintiff's abandoned claims, the individual defendants are hereby DISMISSED.

The University now moves for a summary judgment on the plaintiff's remaining claims brought against it pursuant to the ADA and Rehabilitation Act.

### III. SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure authorizes summary judgment against a party who fails to make a sufficient showing of the existence of an element essential to the

party's case and on which that party bears the burden at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). The movant bears the initial burden of "informing the district court of the basis for its motion" and identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323; *see also Martinez v. Schlumber*, *Ltd.*, 338 F.3d 407, 411 (5th Cir. 2003). Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

If the movant meets its burden, the burden then shifts to the nonmovant to "go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Stults v. Conoco, Inc.*, 76 F.3d 651, 656 (5th Cir. 1996) (citing *Tubacex*, *Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995); *Little*, 37 F.3d at 1075). "To meet this burden, the nonmovant must 'identify specific evidence in the record and articulate the 'precise manner' in which that evidence support[s] [its] claim[s].'" *Stults*, 76 F.3d at 656 (citing *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir.), *cert. denied*, 513 U.S. 871, 115 S. Ct. 195, 130 L. Ed.2d 127 (1994)). It may not satisfy its burden "with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little*, 37 F.3d at 1075 (internal quotation marks and citations omitted). Instead, it "must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *American Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Intern.*, 343 F.3d 401, 405 (5th Cir. 2003) (citing *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).

"A fact is material only if its resolution would affect the outcome of the action, . . . and an issue is genuine only 'if the evidence is sufficient for a reasonable jury to return a verdict for the [nonmovant].'" *Wiley v. State Farm Fire and Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009) (internal citations omitted). When determining whether a genuine issue of material fact has been established, a reviewing court is required to construe "all facts and inferences . . . in the light most favorable to the [nonmovant]." *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005) (citing *Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 568 (5th Cir. 2003)). Likewise, all "factual controversies [are to be resolved] in favor of the [nonmovant], but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Boudreaux*, 402 F.3d at 540 (citing *Little*, 37 F.3d at 1075 (emphasis omitted)). Nonetheless, a reviewing court is not permitted to "weigh the evidence or evaluate the credibility of witnesses." *Boudreaux*, 402 F.3d at 540 (quoting *Morris*, 144 F.3d at 380). Thus, "[t]he appropriate inquiry [on summary judgment] is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Septimus v. Univ. of Hous.*, 399 F.3d 601, 609 (5th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 – 52 (1986)).

## IV.   ANALYSIS AND DISCUSSION

### A.   The Plaintiff's Claim of Disability Discrimination

Although both Title II of the ADA and Section 504 of the Rehabilitation Act prohibit discrimination against qualified individuals with disabilities, "the statutes govern different entities: the ADA applies only to public entities, including private employers, 42 U.S.C. § 12131(1), whereas the [Rehabilitation Act] prohibits discrimination in federally-funded programs and activities, 29 U.S.C. § 794(a)." *Kemp v. Holder*, 610 F.3d 231, 234 – 35 (5th Cir. 2010).

Nonetheless, "[t]he [Rehabilitation Act] and the ADA are judged under the same legal standards, and the same remedies are available under both Acts." *Id.* (citing *Delano-Pyle v. Victoria Cnty., Tex.*, 302 F.3d 567, 574 (5th Cir. 2002)). Specifically, Title II of the ADA provides that "no qualified individual with a disability[1] shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Likewise, Section 504 of the Rehabilitation Act provides, in relevant part, that "[n]o otherwise qualified individual with a disability in the United States, . . . shall solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

A plaintiff states a claim under Title II of the ADA or Section 504 of the Rehabilitation Act "in the context of a student excluded from an educational program," if he establishes that: (1) he has a qualifying disability; (2) he is qualified to participate in the defendant's program; and (3) he was excluded from the defendant's program due to his disability. *Maples v. Univ. of Tex. Med. Branch at Galveston*, 901 F. Supp. 2d 874, 879 -880 (S.D. Tex. 2012), aff'd 524 Fed. Appx. 93 (5th Cir. 2013) (internal citations omitted).

"The only material difference between [Title II of the ADA and Section 504 of the Rehabilitation Act] lies in their respective causation requirements." *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005) (internal citations omitted). Section 504 of the Rehabilitation Act prohibits discrimination "solely by reason of" a person's disability, whereas Title II of the ADA provides that "discrimination need not be the sole reason" for the adverse action or exclusion but rather "a motivating factor." *Pinkerton v. Spellings*, 529 F.3d 513, 516 –

---

[1] The term "qualified individual with a disability" within the meaning of the ADA, means an individual "who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

19 (5th Cir. 2008); *see also Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 503 - 04 (5th Cir. 2002). Nevertheless, "[a] plaintiff asserting a private cause of action for violations of the ADA or the [Rehabilitation Act] may only recover compensatory damages upon a showing of intentional discrimination." *Delano-Pyle*, 302 F.3d at 574 (citing *Carter v. Orleans Parish Pub. Sch.*, 725 F.2d 261, 264 (5th Cir. 1984)).

The plaintiff alleges that he is a visual learner and that he suffers from "obsessive compulsive disorder, severe anxiety leading to occasional panic attacks, major depressive disorder, and a history of migraines." (Dkt No. 7, ¶ 25). He further contends that his "disability prevented him from learning information from [Dr. Cleary's Gross Anatomy] lecture alone with no visual stimulus." (Dkt. No. 75, Ex. 1). The University, in contrast, argues that the plaintiff has failed to establish that he has a qualifying disability and that he was subject to discrimination because of that disability. It further maintains that even assuming that the plaintiff's disorders constitute "disabilities", the plaintiff has failed to establish that he was qualified to continue enrollment in the University's medical school program. This Court is inclined to agree.

First, aside from his *own* allegations, there is no evidence in the record that the plaintiff's "visual learning" *disability* exists or that it imposes any limits on him or limits any of his major life activities. *See Mosley v. Potter*, No. H–05–2816, 2007 WL 1100470, at *4 (S.D. Tex. April 11, 2007) (recognizing that to establish a "disability" "[a] plaintiff must prove a substantial limit with specific evidence that his particular impairment substantially limits his particular major life activity"). The ADA defines "disability" as "a mental or physical impairment [which] must substantially limit an individual's ability to perform at least one major life activity.[2]" *Waldrip v. Gen. Elec. Co.*, 325 F.3d 652, 655 (5th Cir. 2003). "A physical impairment, standing alone, is

---

[2] "[T]he relevant definition of disability set forth in the ADA is applicable to claims made under the [Rehabilitation Act]." *Kemp*, 610 F.3d at 234 (internal citation omitted).

not necessarily a disability as contemplated by the ADA." *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir. 1995). Whether an impairment is substantially limiting depends on "its nature and severity, its duration or expected duration, and its permanent or expected permanent or long-term impact." *Dupre v. Charter Behavioral Health Sys. of Lafayette Inc.*, 242 F.3d 610, 614 (5th Cir. 2001); *see also Pegram v. Honeywell, Inc.*, 361 F.3d 272, 285 (5th Cir. 2004). "[A] plaintiff must prove a substantial limit with specific evidence that *his particular* impairment substantially limits *his particular* major life activity." *Waldrip*, 325 F.3d at 656. (emphasis in original). The plaintiff has proffered no such evidence in this case.

Second, this Court finds no evidence that the plaintiff was "otherwise qualified" to participate and/or continue enrollment in the University's medical school program as he missed both his Gross Anatomy and Histology exams due to health complications and admittedly refused to provide the University with, *inter alia*, his hospital discharge summary and certification from his treating psychiatrist verifying that he was not a danger to himself or others and was fit to resume classes. As a result, the plaintiff was not permitted to reschedule his missed exams and a grade of "Withdrawn" was entered for his fall 2011 courses.

The evidence in the record establishes that during a meeting with University personnel on October 7, 2011, apprehensions regarding the plaintiff's health and his physician's concerns that he had intentionally tried to harm himself by drinking antifreeze were discussed. (Dkt. No. 69, Ex. 1 at 193:10 – 21). Thereafter, the University ordered the plaintiff to provide his discharge summary along with a certification from his treating psychiatrist before resuming classes. The plaintiff admits that he did not provide the University with the certification because he did not feel that it was necessary. (Dkt. No. 69, Ex. 1 at 19: 15 – 20). In the absence of the requested documentation, the plaintiff was not eligible to reschedule his exams. Given the

plaintiff's *own* admissions regarding his lack of cooperation and failure to provide a certification of fitness from his treating psychiatrist, no reasonable jury could conclude that he was otherwise qualified to continue enrollment at the University.

Third, the plaintiff has proffered no evidence demonstrating that the University's decision to withdraw him from its program was based on his disability. The plaintiff does not identify any evidence establishing that his disability was a motivating factor in the University's decision to remove him from its medical school program. Instead, the record demonstrates that the University's removal of the plaintiff was consistent with its performance requirements and was made only after numerous attempts to reasonably accommodate the plaintiff's disability. *See Shaboon v. Duncan*, 252 F.3d 722, 731 (5th Cir. 2001) (reasoning that the dismissal of a medical student due to concerns about the student's mental health and fitness to perform as a doctor combined with the student's failure to provide a certification of fitness from his treating psychiatrist constitutes "a sound basis for dismissal."). Since the plaintiff has failed to set forth any evidence creating a fact issue from which a jury could conclude that the University "withdrew" him from its medical program because of his disability, he cannot establish a claim of disability discrimination under the ADA or the Rehabilitation Act.

### B. The Plaintiff's Failure-to-Accommodate Claim

"Under Title II [of the ADA] and the [Rehabilitation Act], discrimination by a public entity includes failing to make reasonable modifications or accommodations [for] the disabled individual, so that [he] can participate in the programs or activities provided by the public entity." *Aragona v. Berry*, 3:10-CV-1610-G, 2012 WL 467069, *10 - 11 (N.D. Tex. Fed. 14, 2012) (internal citations omitted); *see also* 28 C.F.R. § 35.130(b)(7); 34 C.F.R. § 104.44(a). The plaintiff, however, bears the burden of requesting reasonable accommodations. *Jenkins v. Cleco*

*Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007) (citing *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 n. 4 (5th Cir. 1999)). Once a qualified individual with a disability requests reasonable accommodations, "the public entity has an obligation to engage in an 'interactive process' to determine the best means of accommodating the plaintiff's disability." *Aragona*, 2012 WL 467069 at * 10 (citing *Loulseged*, 178 F.3d at 735).

The University moves for summary judgment on the plaintiff's failure-to-accommodate claim, asserting that the only clear allegation in the plaintiff's amended complaint related to any specific denial of accommodation concerns Dr. Cleary's October 2010 PowerPoint lecture presentation. It contends that the record is devoid of any evidence demonstrating that the denial of any such accommodation led to the plaintiff's withdrawal from the University's medical school program. In fact, the University maintains that it went well beyond the "interactive process" required by the ADA and the Rehabilitation Act in a repeated effort to assist the plaintiff in passing his Gross Anatomy class over a span of several years.

The plaintiff, in contrast, insists that the University refused to provide reasonable accommodations to him in consideration of his disability when it denied him access and/or the opportunity to review Dr. Cleary's October 2010 PowerPoint lecture presentation. As indicated above, the plaintiff asserts that he is "a visual learner and benefits from visual aids and resources for retaining information and studying for exams." He acknowledges that all of his other medical school professors, except for Dr. Cleary, provided him and other students access to visual aids, other resources and presentations both inside and outside of the classroom.

While the ADA does provide a right to reasonable accommodation, it does not, however, mandate that a plaintiff be given his or her *preferred* accommodation. *See E.E.O.C. v. Agro Distrib., LLC*, 555 F.3d 462, 471 (5th Cir. 2009) (emphasis added). The process of obtaining

and creating reasonable accommodations in the academic setting differs from that in the employment setting. For instance, under the Rehabilitation Act, a school is required to "make such modifications to its academic requirements as are necessary to ensure that such requirements do not discriminate or have the effect of discriminating, on the basis of handicap, against a qualified handicapped applicant or student." 34 C.F.R. § 104.44(a). Such "[m]odifications may include changes in the length of time permitted for the completion of degree requirements, substitution of specific courses required for the completion of degree requirements, and adaptation of the manner in which specific courses are conducted." *Id.* Likewise, under the ADA, a school is required to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability . . . ." 28 C.F.R. § 35.130(b)(7).

Nonetheless, under no circumstances is the University required to provide accommodations that would "fundamentally alter the nature of the service, program, or activity" and need not alter eligibility criteria that are "shown to be necessary for the provision of the service, program, or activity being offered." 28 C.F.R. § 35.130(b)(7) – (8); *see also Maples*, 901 F. Supp. 2d at 883. Federal law "does not mandate that an educational institution 'lower or [ ] effect substantial modifications of standards to accommodate a handicapped person,' assuming such standards are reasonable." *McGregor v. La. State Univ. Bd. of Supervisors*, 3 F.3d 850, 858 (5th Cir. 1993) (quoting *Southeastern Cmty. Coll. v. Davis*, 442 U.S. 397, 423, 99 S. Ct. 2361, 60 L. Ed.2d 980 (1979)), *cert. denied*, 510 U.S. 1131, 114 S. Ct. 1103, 127 L. Ed.2d 415 (1994).; *see also Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 n.11, 106 S. Ct. 507 (1985) (quoting *Bd. of Curators, Univ. of Mo. v. Horowitz*, 435 U.S. 78, 96 n. 6, 98 S. Ct. 948, 958, 55 L .Ed.2d 124 (1978) ("University faculties must have the widest range of discretion in making

judgments as to the academic performance of students and their entitlement to promotion or graduation.")). Absent evidence of discriminatory intent or disparate impact, reasonable deference must be accorded to an educational institution's academic decisions. *McGregor*, 3 F.3d at 859. (internal citations omitted).

The plaintiff's deposition testimony and other evidence in the record establish that the University provided reasonable accommodations to the plaintiff when timely requests for such were made by him. For example, the plaintiff does not dispute that the University: (1) arranged for the plaintiff to meet and/or receive counseling from at least five different faculty members regarding his Gross Anatomy concerns; (2) directed him to the medical school's learning specialist, Pam Bass on more than one occasion; (3) permitted him to enter the Alternative Pathway program which splits the first year of medical school into two years, to avoid failing Gross Anatomy in 2009; and (4) granted him permission to take a medical leave of absence to avoid failing Gross Anatomy in 2010. (Dkt. No. 69, Exs. 3 – 17).

Even the email exchanges between the plaintiff and Dr. Cleary, the professor at the crux of the plaintiff's complaints, demonstrate empathy for the plaintiff's plight as well as a commitment to accommodate the plaintiff's disabilities. In one of the e-mail exchanges, for instance, Dr. Cleary provided advice to the plaintiff regarding remediation, indicated his willingness to meet with him outside of class and directed the plaintiff to Pam Bass, the medical school's learning specialist. Moreover, Dr. Cleary assisted the plaintiff in obtaining access to online lecture PowerPoint files and indicated that while the October 2010 PowerPoint lecture presentation was not generally available, the plaintiff could still view the lecture slides from the streaming video of the class that was available. (Dkt. No. 69, Exs. 3 & 14). Further, any claim related to the University's failure to provide the October 2010 PowerPoint lecture presentation is

barred by the applicable two-year statute of limitations period. *Frame v. City of Arlington*, 657 F.3d 215, 237 (5th Cir. 2011) (reasoning that claims under both Title II of the ADA and the Rehabilitation Act are analogous to personal injury claims and are subject to the two-year limitations period applicable to such claims).

The undisputed evidence in the record demonstrates that the University complied with the ADA and the Rehabilitation Act in providing the plaintiff with reasonable accommodations when he timely requested them. However, in spite of the accommodations provided by the University, the plaintiff was unable to perform at the required level and failed to comply with the University's policies by undertaking steps to alleviate its concerns relative to his mental fitness and propensity to cause harm to himself and others. The federal disability discrimination laws mandate only the right to reasonable accommodations for qualified individuals with disabilities; they do not provide an automatic right to a plaintiff's preferred accommodations or unfettered admission/access to the plaintiff's chosen educational institution.

C. **The Plaintiff's Retaliation Claim**

The plaintiff further appears to allege that he was retaliated against after requesting reasonable disability accommodations, namely his request to review the October 2010 PowerPoint lecture presentation for his Gross Anatomy class. In order to establish a *prima facie* case of retaliation under the ADA and/or the Rehabilitation Act, a plaintiff must establish that: (1) he engaged in a protected activity, such as the filing of an EEO complaint; (2) he was subjected to an adverse action by the public entity; and (3) a causal nexus subsisted between the adverse action and the protected activity. *Calderon v. Potter*, No. 04-40190, 2004 WL 2375543, *5 (5th Cir. Oct. 19, 2004); *see also Shannon v. Henderson*, No. 01-10346, slip op. at 8, 275 F.3d 42, 2001 WL 1223633 (5th Cir. Sep. 25, 2001) (finding the standards for analyzing retaliation

claims brought under the ADA and Title VII applicable to a plaintiff's retaliation claim brought under the Rehabilitation Act).

In his amended complaint, the plaintiff alleges that the University retaliated against him by demanding payment of a $5,000 Perkins loan he was awarded for the 2011-2012 academic year. In his response in opposition to the University's motion for summary judgment, however, the plaintiff maintains that he engaged in protected activity "when he requested reasonable accommodation from the [University] in providing him access to the PowerPoint lecture presentation to enable him to study effectively for the block 1 examination." (Dkt. No. 75 at 12). He argues that the University, in turn, retaliated against him by accusing him to be a danger to himself and others and by arbitrarily demanding that he provide private, detailed medical documentation from his treating physicians.

With regard to the plaintiff's claim of retaliation premised on the University's attempts to collect on a Perkins' loan, the plaintiff proffers no evidence of any unlawful acts of retaliation utilized by the University nor any links to any purported protected activity that he might have undertaken. Rather, the plaintiff concedes that he obtained a loan from the University in connection with his medical school enrollment and does not dispute that he did not repay the loan upon his withdrawal from the University. (Dkt. No. 69 at Ex. 23). Thus, the University is entitled to judgment as a matter of law on the plaintiff's retaliation claim premised on the University's attempts to collect on a Perkins' loan.

The plaintiff's claim of retaliation premised on his requests for access to the PowerPoint lecture presentation similarly fails as the plaintiff has not shown how any such request constitutes "engagement in protected activity." Moreover, as set forth above, the summary judgment evidence does not demonstrate that the plaintiff's withdrawal from the University's

medical program would not have occurred but for his request for the PowerPoint lecture presentation as opposed to his various health concerns. Finally, the plaintiff has not presented evidence sufficient to create a genuine issue of material fact as to whether a causal nexus subsisted between his purported protected activity and any alleged adverse action undertaken by the University or that the University's decision to withdraw his admission was the result of intentional discrimination based on his disability.

## V. CONCLUSION

Based on the foregoing analysis and discussion, the defendants' motion for summary judgment is GRANTED.

It is so **ORDERED**.

SIGNED on this 24th day of October, 2014.

_____
Kenneth M. Hoyt
United States District Judge